**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| LILLIAN HOHENSTEIN, Individually and On Behalf of All Others Similarly Situated<br><br>                          Plaintiff,<br><br>vs.<br><br>BEHRINGER HARVARD REIT I, INC., BEHRINGER HARVARD HOLDINGS LLC, ROBERT M. BEHRINGER, ROBERT S. AISNER, STEVEN W. PARTRIDGE, RONALD WITTEN, SCOTT W. FORDHAM, JAMES E. SHARP, and CHARLES G. DENNIS,<br><br>                        Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br><br>Case No. 3:12-CV-03772 |

## CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

1.       Lead Plaintiffs Dennis Weiss ("Weiss"), Milton and Glenna Barrett (the "Barretts"); Dr. Donald Schaffer ("Schaffer"); Marcia Scheuner ("Scheuner"); and Sandra Lehman ("Lehman") (collectively the "Weiss Group" or "Lead Plaintiffs"), by and through their undersigned counsel, allege, upon knowledge as to themselves and their own actions, and otherwise upon information and belief, based on an investigation conducted by their counsel which included, among other things, a review of public statements and filings with the Securities and Exchange Commission ("SEC") by defendants herein, as follows:

## SUMMARY OF THE ACTION

2.       This is a class action on behalf of investors of Behringer Harvard REIT I ("BH REIT" or the "Company"), against BH REIT, the parent company of its advisor Behringer Harvard Holdings, LLC, and its Board of Directors (the "Board") (the "Individual Defendants")

(collectively "Defendants") for violating federal securities laws and breaching their fiduciary duties to Lead Plaintiffs and the proposed class.

3.     With the contraction of the United States economy, the Federal Reserve Board has continued to pursue a policy of historically low interest rates.  The current rates of interest available to savers are the lowest in the history of the country.  Passive investors seeking reasonable risk adjusted returns have few attractive options. Individual savers, in particular, have been hard hit because safe investments traditionally available to "Mom and Pop" savers such as certificates of deposit, money market funds, and highly rated corporate bonds offer almost no return on investment.  These developments have left retirees and other retail investors vulnerable to investment promoters who promise attractive rates of return.

4.     Defendants are in the business of selling investments in real estate investment trusts, or "REITs."   Most REIT shares are registered for trading on a national securities exchange.  Publicly traded REIT shares are widely followed by securities analysts and their share prices fluctuate with changes in the REIT's portfolio and economic conditions.  Other REITs, such as BH REIT are referred to as "non-traded REITs," as their shares are not registered for trading on any exchange.  Investors in non-traded REITs generally expect to hold their shares for a five to seven year term, with the understanding that the sponsor will seek to list the shares on a national securities exchange. Investors depend on the legitimate operation and accounting of the REIT's business and the sale of properties or listing for the return of their principal.  Investors in non-traded REITs who seek to sell their shares before the term of the investment must either resell their shares to the sponsor or sell in an inefficient secondary market, usually at severe discounts. Because non-traded REIT shares do not trade in an open market, investors depend on the disclosures made by the sponsor for information about the value of the REIT's shares.

5.     Because the Company's shares are not listed on a national exchange, BH REIT is by definition an illiquid investment.  Thus, the Company's articles of incorporation require that the Company provide shareholders with a liquidity event by 2017 by means of liquidation of its real estate investments and subsequent distribution to shareholders (the "Liquidation"), if its common stock is not listed by the Liquidation deadline, unless that deadline is extended.

6.     Lead Plaintiffs and the proposed class invested in BH REIT with the understanding that the money they invested with Defendants would be used to pursue the stated investment objectives of BH REIT which were: "to preserve, protect and return your capital contributions, to maximize cash distributions paid to you, to realize growth in the value of our investments upon our ultimate sale of such properties; and to list the shares for trading on a national securities exchange...." The offerings in which Lead Plaintiffs and the proposed class invested were structured as so-called "blind pool" offerings in which Plaintiff and the proposed class pledged their money before knowing what properties Defendants would purchase with the net offering proceeds.  Lead Plaintiffs necessarily depended on the accuracy of Defendants' disclosures about their investment objectives and policies to assess the risks associated with investment and upon Defendants acting in good faith and consistent with their fiduciary duties to their investors.

7.     BH REIT's initial pubic offering occurred over a two-year period, commencing on February 19, 2003, and ending on February 19, 2005 (the "Initial Offering").  The Initial Offering consisted of 80 million shares at a price of $10 per share.  BH REIT also offered up to 8 million additional shares at $10 per share under its distribution reinvestment plan or "DRP" at this time.  The Company commenced a second public offering of 80 million shares of common stock at $10 per share on February 11, 2005 (the "Second Offering").  The Second Offering also

offered 16 million additional shares at $9.50 per share.  The Second Offering was terminated on October 20, 2006.  BH REIT then commenced a third public offering (the "Third Offering") on October 20, 2006.  Under this offering, the Company offered 200 million shares at $10 per share and an additional 50 million shares at $9.50 per share.

8.      Since investing in BH REIT, Lead Plaintiffs and the proposed class have seen the value of their investment plummet.  On December 28, 2011, Defendants filed a Form 8-K with the SEC estimating the per share value of the Company's common stock to be $4.64 per share, a decline of **53.6%** for those shareholders, such as Lead Plaintiffs, who purchased Company stock at $10 per share.  It is doubtful that BH REIT stock is even worth the $4.64 disclosed by the Defendants, as the Company's shares have recently traded in the secondary market for as little as **$2.40 per share**.   As of December 17, 2012, BH REIT disclosed in a Form 8-K filed with the SEC on December 20, 2012, that BH REIT shares were worth an estimated $4.01 per share.

9.      Each of the Lead Plaintiffs purchased additional shares in BH REIT pursuant to the Company's Distribution Reinvestment Program or "DRP" on or after January 5, 2009.  On January 5, 2009, Defendants arbitrarily priced Behringer Harvard stock at $9.50 per share. Nonetheless, in conscious disregard of their known fiduciary duties, Defendants continued to sell the stock at $9.50 price until June 2010, when they unilaterally dropped the price to $4.64 per share, despite no material change in the Company's business and prospects.  At the time the shares were sold pursuant to the DRP, Defendants knew, or recklessly disregarded, that the shares were worth substantially less than $9.50 per share.

10.      Lead Plaintiffs purchased shares through the DRP at arbitrary and inflated prices that did not reflect the true value of the Company.  Defendants set the prices at which Plaintiffs and Class members purchased shares in connection with the DRP utilizing an arbitrary

methodology and consciously ignored their fiduciary duties by failing to inform themselves of the true value of the Company and by allowing management to utilize a methodology that materially overstated the value of BH REIT shares.

11.     During the Class Period, Class members are believed to have purchased at least $50 million worth of BH REIT shares at inflated prices under the DRP.  Between January 5, 2009, and May 2010, BH REIT charged Class members $9.50 a share for purchases under the DRP despite knowing that the stock was worth approximately half this amount.  The Company dropped this price to $4.64 per share in May 2010.

12.     In addition to selling knowingly overpriced shares, BH REIT has apparently operated essentially what one might characterize as a giant Ponzi scheme.  Although BH REIT has consistently paid distributions to its shareholders, it has **never** paid them out of true operating cash flow.  Instead, Defendants have paid dividends out of offering proceeds from new investors.  This flies in the face of BH REIT's stated investment objective of preserving its shareholders' capital contributions.  Defendants paid these dividends to Plaintiffs and the Class to create the illusion that BH REIT was a successful REIT.  Based on the purported "success" of BH REIT, Defendants launched additional REIT offerings through which Defendants are making millions in sales and management fees.  Defendants have mismanaged BH REIT – paying dividends out of new offering proceeds and not acting to preserve capital contributions – so they could enrich themselves by marketing and selling other REITs, a breach of their duty of loyalty.

13.     Potentially worse than the illiquid nature of BH REIT securities, Defendants have made it even harder for the Company's shareholders to exit their investments by both misrepresenting its true value and amending the Company's charter to make it more difficult for third parties making a tender offer for BH REIT shares.

14.     In March 2009, BH REIT suspended its shareholder redemption program under which shareholders could sell their shares back to the Company.  Then, on April 1, 2011, BH REIT filed a Schedule 14A Proxy Statement with the SEC seeking shareholder approval to amend and restate its charter to require any person making a tender offer, including any mini tender offer for fewer than 5% of outstanding securities, to comply with most of the provisions of Regulation 14D of the Securities Exchange Act of 1934 (the "Exchange Act").  Defendants explained to Plaintiffs and the Class that the amendments were necessary, in part, to restate the Company's charter to effect the Liquidation.  What Defendants were actually trying to do, however, was preserve control over the Company.  BH REIT shareholders approved the restated charter based on Defendants' material misrepresentations and, therefore, their only means of achieving liquidity now is attempting to tender their shares to third parties under a much more restrictive standard or wait for a possible Liquidation event sometime in the future.

15.     Defendants' representations regarding the Company's share valuation and the prospects for the Liquidation are extremely important to its shareholders given the non-public nature of the REIT.  BH REIT's shareholders rely upon Defendants' representations when making material decisions regarding their investments, such as when deciding whether to accept or reject occasional tender offers such as those made by CMG Legal Income Fund and its affiliates ("CMG") on August 23, 2011, and February 23, 2012 (the "CMG Tender Offers").

16.     In a September 7, 2011 Schedule 14D-9 and again in a February 24, 2012 14D-9, Defendants claimed that shareholders should reject CMG's Tender Offers in part because of their estimated value of BH REIT exceeded that of the Tender Offers.  However, Defendants blatantly misrepresented the true value of BH REIT to keep shareholders from tendering their shares.  Defendants did this because tendering jeopardized their ability to maintain control over BH

REIT.  If Defendants lost control over the Company, then they potentially would no longer be able to sell other multi-million dollar REIT offerings and earn tens of millions of dollars in sales and management fees from these other REITs.  Also, they would no longer be able to profit from the millions of dollars in asset and property management fees they charge to BH REIT every year despite the Company's poor operational performance.  Moreover, Defendants failed to inform BH REIT shareholders that CMG's tender offers were a timely liquidity event and viable exit strategy for shareholders who wished to achieve liquidity and exit the investment.

17.    By encouraging Lead Plaintiffs and the Class to repose trust and confidence in Defendants and soliciting their investments in BH REIT, Defendants assumed a duty to deal fairly and forthrightly with Plaintiff and to refrain from engaging in the acts, practices and courses of conduct described in this complaint.  Defendants knew that by their actions they were likely to mislead Plaintiffs and cause financial and other injury to them.  By engaging in the actions described in the complaint, Defendants breached and continue to breach their fiduciary duties to Plaintiffs.  Moreover, Defendants have damaged BH REIT's shareholders who were encouraged by false and misleading SEC filings disseminated by Defendants to not tender their shares to a third party.

### JURISDICTION AND VENUE

18.    This Court has subject matter jurisdiction over this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. 78aa, 28 U.S.C. §§1331, 1337, and the principles of supplemental and pendent jurisdiction.

19.    This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d).  The matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and this action is a class action in which members of the class of plaintiffs are citizens of

States different from one or more defendants. This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

20.     This Court has jurisdiction over each Defendant because each Defendant is either a corporation that conducts business in, and maintains operations in, this District, or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District court permissible under traditional notions of fair play and substantial justice.

21.     Venue is proper in this District pursuant to 28 U.S.C. §139l(a) because (1) one or more defendants either reside in, or maintain executive offices in, this District; (2) a substantial portion of the transactions and wrongs complained of herein, including Defendants' primary participation in the wrongful acts detailed herein, occurred within this District, and (3) Defendants have received substantial compensation in this District by conducting business herein and by engaging in numerous activities that have had an effect in this District.

22.     In connection with the acts, conduct and other wrongs complained or herein, the Individual Defendants used the means and instrumentalities of interstate commerce.

**THE PARTIES**

23.     Lead Plaintiffs Dennis Weiss, Milton and Glenna Barrett, Dr. Donald Schaffer, Marcia Scheuner, and Sandra Lehman purchased BH REIT common stock during the Class Period as set forth in their certifications previously submitted to the Court and suffered economic losses as a direct result of Defendants' unlawful conduct alleged herein.  Lead Plaintiffs also purchased BH REIT shares via the DRP.

24.     BH REIT I, Inc., was incorporated in June 2002 as a Maryland corporation and has elected to be taxed and currently qualifies as a real estate investment trust.  BH REIT maintains its headquarters at 17300 Dallas Parkway, Suite 1010, Dallas, Texas 75248.  BH REIT

purports to operate institutional quality real estate.  BH REIT completed its first property acquisition in October 2003, and as of December 31, 2011, BH REIT owned 57 properties located in 21 states and the District of Columbia.

25.     Until August 31, 2012, BH REIT was externally managed and advised by BH Advisors, LLC ("Behringer Advisors").  Behringer Advisors in its capacity as BH REIT's advisor was responsible for "managing the Company's day-to-day affairs."  To become a "self-managed" REIT, effective August 31, 2012, BH REIT hired 54 persons previously employed by Behringer Advisors, although BH REIT will continue to purchase core services from Behringer Advisors, such as human resources and information technology.  BH REIT also contracts with HPT Management Services, LLC ("HPT Management"), which manages BH REIT's properties. Both Behringer Advisors and HPT Management are owned and controlled by Behringer Harvard Holdings, LLC, or one of its subsidiaries.

**Behringer Harvard Holdings, LLC**

26.     Behringer Harvard Holdings, LLC ("Behringer Harvard Holdings"), is a limited liability company incorporated in the State of Delaware which maintains its headquarters in Addison, Texas.  Defendant Behringer is the majority owner, sole manager, and Chief Executive Officer of Behringer Harvard Holdings.  Behringer Harvard Holdings is also the parent corporation of Behringer Advisors and HPT Management.

**The Director Defendants**

27.     Defendant Robert M. Behringer ("Behringer") is the Chairman of BH REIT's Board of Directors (the "Board") and has been a director since June 2002.  Behringer served as BH REIT's Chief Executive Officer from June 2002 to June 2008.  He has served as the sole manager and Chief Executive Officer of Behringer Harvard Holdings, LLC, since December 2001.  Given his experience and management positions at the Company, access to internal

corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to him in connection therewith, Defendant Behringer is familiar with the wrongful conduct alleged herein and helped to facilitate that conduct. Defendant Behringer is a citizen of the State of Texas and a resident of Dallas County.

28.     Defendant Robert S. Aisner ("Aisner") has been the President of BH REIT since May 2005 and a director since June 2002.   Additionally, Defendant Aisner has served as the Company's Chief Executive Officer since August 2009.  He also held this position from June 2008 until May 2009.  Defendant Aisner also served as the Company's Chief Operating Officer from February 2003 to June 2008.  Given his experience and management positions at the Company, access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to him in connection therewith, Defendant Aisner is familiar with the wrongful conduct alleged herein and helped to facilitate that conduct.  Aisner is a citizen of the State of Texas and a resident of Collin County.

29.     Defendant Steven W. Partridge ("Partridge") has been a director of BH REIT since October 2003.   Given his experience and positions at the Company, access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to him in connection therewith, Defendant Partridge is familiar with the wrongful conduct alleged herein and helped to facilitate that conduct. Defendant Partridge is a citizen of the State of Texas and a resident of Dallas County.

30.     Defendant Ronald Witten ("Witten") has been a director of BH REIT since April 2004.   Given his experience and positions at the Company, access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to him in connection therewith, Defendant Witten is familiar with the wrongful conduct alleged herein and helped to facilitate that conduct.  Defendant Witten is a citizen of the State of Texas and a resident of Dallas County.

31.     Defendant Charles G. Dennis ("Dennis)" has been a director of BH REIT since January 2003.  Due to his experience and positions at the Company, access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to him in connection therewith, Defendant Dennis is familiar with the wrongful conduct alleged herein and helped to facilitate that conduct.  Defendant Dennis is a citizen of the State of Texas and a resident of Dallas County.

32.     Defendants Behringer, Aisner, Partridge, Witten and Dennis comprise the current BH REIT Board of Directors and were members of the BH REIT Board at all relevant times:

(a)     Defendants Behringer, Aisner, Partridge and Witten authorized, signed, and filed with the SEC BH REIT's Registration Statement on Form S-3 dated January 5, 2009.

(b)     Defendants Behringer, Aisner, Partridge and Witten authorized, signed, and filed with the SEC BH REIT's Annual Reports on Forms 10-K dated March 31, 2008, and March 18, 2010.

(c)     Defendants Behringer and Aisner authorized, signed, and filed with the SEC BH REIT's Current Report on Form 8-K dated March 30, 2009.

(d)     Defendants Behringer, Aisner, Partridge and Witten authorized and filed with the SEC, and disseminated to BH REIT's shareholders the September 7, 2011, and February 24, 2012 Schedule 14D-9s.

(e)     Defendants Behringer, Aisner, Partridge, Witten and Dennis made the recommendation that BH REIT shareholders should reject CMG's Tender Offers.

(f)     Defendants Behringer, Aisner, Partridge, Witten and Dennis authorized, filed with the SEC and disseminated to BH REIT shareholders the April 4, 2011 Proxy and the supplements thereto dated May 9, 2011, and May 31, 2011.

(g)     The shareholders' votes on the Proxy were solicited "By Order of the Board of Directors."

(h)     Defendants Behringer, Aisner, Partridge, Witten and Dennis are liable individually and collectively as primary violators for making false and misleading statements.

(i)     Defendants Behringer, Aisner, Partridge, Witten, and Dennis are collectively referred to herein as the "Director Defendants."

33.     The Defendants identified in paragraphs 27 through 32 are key members of the BH REIT Board and/or BH REIT officers and are collectively referred to herein as the "Individual Defendants."  By virtue of their positions as directors and/or officers of BH REIT, the Individual Defendants are fiduciaries to the Lead Plaintiffs and the other proposed class members and owe Lead Plaintiffs and the proposed class the highest duties of loyalty, good faith, fair dealing, due care, and full and fair disclosure.  Each of the Individual Defendants has, and at all times relevant herein, had the power to control and influence and did in fact control and influence BH REIT to engage in the practices complained of herein.

## DUTIES OF THE INDIVIDUAL DEFENDANTS

34.     By virtue of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its shareholders the fiduciary obligations of good faith, trust, loyalty, and due care, and were, and are, required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner.   The Individual Defendants were, and are, required to act in furtherance of the best interests of the Company's shareholders so as to benefit all shareholders equally, and not in furtherance of their personal interest or benefit.

35.     Each director and officer of the Company owes to Lead Plaintiffs and the proposed class the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.   In addition, as officers and directors, the Individual Defendants also had a duty to promptly disseminate accurate and truthful information with regard to the Company's revenue, margins, operations, performance, management, projections and forecasts so that valuation of the Company's stock would be based on truthful and accurate information.

36.     The Individual Defendants, because of their positions of control and authority as directors and/or officers were able to, and did, directly and/or indirectly exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.   Because of their executive, management and/or director positions, each of the Individual Defendants had access to adverse, non-public information about the financial condition, operations, and misrepresentations made.

37.     At all times relevant hereto, each of the Individual Defendants was the agent of the other Individual Defendants and was at all times acting within the course and scope of such agency.

38.     To discharge their duties, the officers and directors of BH REIT were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial affairs of the Company.   By virtue of such duties, the Individual Defendants were required to, among other things:

(a)     manage, conduct, supervise and direct the business affairs of the Company in accordance with all applicable laws;

(b)     neither violate nor knowingly permit any officer, director or employee of the Company to violate applicable laws, rules and regulations;

(c)     establish and maintain systematic and accurate records and reports of the business and affairs of the Company and procedures for the reporting of the business and affairs to the Board and to periodically investigate,  or cause independent  investigation  to be made of, said reports and records;

(d)     neither engage in self-dealing  nor knowingly  permit any officer, director or employee of the Company to engage in self-dealing;

(e)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(f)     conduct the affairs of the Company  in an efficient,  business-like  manner so as to make it possible  to provide the highest  quality  performance  of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(g)     properly and accurately guide investors and analysts regarding the true financial condition of the Company at any given time, including making accurate statements about the Company's true financial condition at any given time, making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times; and

(h)     remain informed of how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to   make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws.

39.     Each of the Individual Defendants, by virtue of his or her position as a director and officer, owed to the Company's shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants alleged herein involves violations of their obligations as directors and officers of the Company, the absence of good faith on their part and a reckless disregard for their duties to the Company and its shareholders.  The Individual Defendants were aware or should have been aware that this posed a risk of serious injury to the Company's shareholders.  The conduct of the Individual Defendants, who were also officers and/or directors of the Company, has been ratified by the remaining Director Defendants who collectively comprised all of the Company's Board during the Class Period.

40.     The Individual Defendants breached their duties of loyalty and good faith by allowing Defendants to cause, or by themselves causing, the Company to misrepresent its

financial results and prospects, as detailed herein, by setting the prices of shares sold in the DRP program at prices above their actual value and by failing to prevent employees and/or officers of the company from taking such illegal actions.

## CLASS ACTION ALLEGATIONS

41.     This is a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired shares in BH REIT from February 19, 2003, to the present (the "Class").  Excluded from the Class are the Defendants and any person, firm, trust, corporation or other entity related to or affiliated with any Defendant.

42.     According to the Company's Form 10-Q filed with the SEC for the quarterly period ended June 30, 2012, BH REIT had 298,461,977 shares outstanding, thus members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members can only be determined through appropriate discovery, members of the Class number at least in the thousands, and they are geographically dispersed.

43.     Lead Plaintiffs' claims are typical of the claims of the Class, because they have the same interests as the other members of the Class and Plaintiffs and the other members of the Class have and will sustain harm arising out of the Individual Defendants' breaches of their fiduciary duties.  Lead Plaintiffs do not have any interests that are adverse or antagonistic to those of the Class.  Lead Plaintiffs will fairly and adequately protect the interests of the Class. Lead Plaintiffs are committed to the vigorous prosecution of this action and have retained counsel competent and experienced in this type of litigation.

44.     There are questions of law and fact common to the members of the Class that predominate over any questions which, if they exist, may affect individual Class members. The predominant questions of law and fact include, among others, whether:

(a)     The Defendants have and are breaching their fiduciary duties owed to Lead Plaintiffs and the Class;

(b)     Whether the members of the Class have sustained damages, and if so, what is the proper measure of damages;

(c)     Whether the Director Defendants violated Section 14(e) of the Exchange Act by causing a materially false and misleading Schedule 14D-9 Solicitation/Recommendation Statements to be issued; and

(d)     Whether the Director Defendants violated Section 14(a) of the Exchange Act by causing a false and misleading Proxy to be issued.

45.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy, since joinder of all members is impracticable.  The prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications with respect to individual members of the Class that would establish incompatible standards of conduct for defendants, or adjudications with respect to individual members of the Class that would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.  Lead Plaintiffs anticipate no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

### A.     Company Overview

46.     Real estate investment trusts, or REITs, are investment vehicles that use the aggregated funds of individual investors to buy and operate income-producing real estate properties and distribute the income to those investors.  In order to qualify as a REIT, the

company must affirmatively elect to be taxed as a REIT and must satisfy a number of requirements.  For one, the company must distribute 90% of its net income to shareholders annually.  In addition, the company must derive 75% of its gross income from investments in real property.

47.   The REIT structure offers a number of benefits, especially favorable tax treatment.  More specifically, REITs do not pay taxes at the corporate level; rather, investors are taxed at their individual tax rates for the ordinary income portion of the dividend.  REITs also offer investors (a) regular dividends, (b) a more liquid position as compared to purchasing real estate directly, and (c) diversification through the ability to own a variety of property types in geographically diverse areas.

48.   Since 2002, Defendants Behringer and Aisner have jointly sold several REITs to investors, including the BH REIT.  The following chart shows the ownership structure of BH REIT and other various Behringer Harvard Entities that are affiliated with it:



[1] Robert M. Behringer, the Chairman of BH REIT, controlled the disposition of approximately 40% of the outstanding limited liability company interests and the voting of 85% of the outstanding limited liability company interests of Behringer Harvard Holdings as of March 31, 2008.

[2] Behringer Harvard holdings owns 100% of the limited liability company interests of Behringer Harvard Partners, LLC.

[3] Behringer Harvard Partners is the 99.9% owner and the sole member of Behringer Advisors, LLC, BH REIT's advisor, and the sole limited partner of each of Behringer Securities, LP, and HPT Management Services LP. Harvard Property Trust, LLC, a wholly-owned subsidiary of Behringer Harvard Holdings, is the owner of the remaining 0.1% and the sole general partner of each of Behringer Advisors and Behringer Securities.  IMS, LLC, another wholly-owned subsidiary of Behringer Harvard Holdings, is the owner of the remaining 0.1% interest and the sole general partner of HPT Management.  Behringer Advisors owns 1,000 shares of BH REIT's convertible stock, which is convertible into shares of common stock in certain circumstances.

[4] Behringer Harvard Holdings currently owns 22,000 of BH REIT's issued and outstanding shares.

[5] BH REIT owns 100% of the shares of BHR, Inc.

[6] BH REIT owns 100% of the shares of BHR BT, Inc., which owns 100% of the interests of BHR Business Trust.

[7] BH REIT owns 100% of the limited liability company interests of BHR Partners, LLC.

[8] As of   March 31, 2008, BHR, Inc. was the sole general partner and owner of 17 general partnership units in Behringer Harvard Operating Partnership I LP, our operating partnership; BHR Business Trust was a limited partner and owner of approximately 181 million partnership units in Behringer Harvard OP; and BHR Partners, LLC was a limited partner and owner of approximately 24.7 million partnership units in Behringer Harvard OP.

49.     BH REIT's articles of incorporation require that the Company liquidate its investments by 2017 and distribute the proceeds to its shareholders (the "Liquidation") if its common stock is not listed by the Liquidation deadline, unless the deadline is extended.

50.     The stated investment objectives of BH REIT are:

(a)     To preserve protect and return capital contributions;

(b)     To maximize distributable cash to investors;

(c)     To realize growth in the value of investments upon the ultimate sale of investments; and

(d)     By 2017, either (1) to cause the shares of the Company either to be listed for trading on a national securities exchange or for quotation on the NASDAQ, or (2) to make an orderly disposition of assets and distribute the cash to investors, unless a majority of the board of directors and a majority of the independent directors approve otherwise.

51.     To achieve its investment objectives, BH REIT's prospectus and the amendments thereto indicate that BH REIT will principally target assets that "are institutional quality office properties that have premier business addresses, desirable locations, personalized amenities, high quality construction and highly creditworthy commercial tenants."

52.     Under these principles, BH REIT has held stock offerings and as a result has raised roughly $2.9 billion.  The following chart shows the opening and closing dates for each of the Company's offerings.

| Offering Schedule | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
|  | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | Present |
| Initial Offering | 2/19/03 |  | 2/15/05 |  |  |  |  |  |  |  |
| Second Offering |  |  | 2/11/05 | 10/20/06 |  |  |  |  |  |  |

| Offering Schedule | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Third Offering | | | | 10/20/06 | | 10/31/08 | | | |
| Current Offering | | | | | | | 01/05/09 | | | (Closes 01/05/14) |

53.     Defendants have compensated themselves handsomely out of the proceeds raised from the offerings.  Defendants, as graphically depicted above, have created a shell game of entities that have drained significant sums of money from BH REIT and its shareholders.  The two primary entities involved are Behringer Advisors, which performs asset management services for BH REIT, and HPT Management, which performs property management services. The following chart depicts the millions of dollars that these two entities and their affiliates have taken since 2004.

| | Property Management Fees (millions) | Asset Management Fees (millions) | Total |
|---|---|---|---|
| 2011 | $13.8 | $19.2 | $33 |
| 2010 | $15.0 | $17.7 | 32.7 |
| 2009 | $15.3 | $18.8 | 34.1 |
| 2008 | $17.4 | $27.8 | 45.2 |
| 2007 | $9.1 | $13.3 | 22.4 |
| 2006 | $4.9 | $5.1 | $10 |
| 2005 | $1.5 | $1.9 | $3.4 |
| 2004 | $0.2 | $.09 | $0.29 |
| Total | $77.2 | $103.89 | $181.09 |

54.     In addition, Behringer Advisors and its affiliates are entitled to receive compensation and fees for services related to BH REIT's offerings.  For example, according to

the Registration Statement on Form S-11 that the Company filed with the SEC on April 7, 2006, Behringer Harvard Advisors and its affiliates could earn as much as $112,090,000 in connection with that particular offering in the form of sales commissions, dealer manager fees, and organization and offering expenses.

55.     According to BH REIT itself, the Company's "advisor and its affiliates, including our property manager, are entitled to substantial fees from us under the terms of our advisory management agreement and property management agreement.  These fees were not negotiated at arm's length…."  Moreover, it does not appear that any of these management agreements were negotiated by or approved by an independent special committee of BH REIT.  Furthermore, Defendants have entered into agreements with Behringer Advisors and HPT Management that create a disincentive to terminate BH REIT's ongoing relationship with these entities and provide an additional incentive for Defendants to utilize them to charge excessive fees. According to Defendants:

> Our advisory management agreement also requires us to pay a performance-based termination fee to our advisor (reduced by the value of shares of common stock issued or issuable upon conversion of our convertible stock) in the event that the advisory management agreement expires and is not renewed or is terminated, other than because of a material breach by the advisor; the holders of the common stock have received distributions equal to the sum of the capital invested by such stockholders and a 9% cumulative, non-compounded, annual return; or the shares of common  stock are listed for  trading on a national securities exchange.  To avoid paying this fee, our independent directors may decide against terminating the advisory management agreement prior to our listing even if, but for the termination fee, termination of the advisory management agreement would be in our best interest.  In addition, the requirement to pay a fee to our advisor at termination could cause us to make different investment or disposition decisions than we would otherwise make, in order to satisfy our obligation to pay the fee to the terminated advisor.

Behringer Harvard REIT I, Inc., Annual Report (Form 10-K) at 28 (March 3, 2006).

56.     Thus, although BH REIT's performance has been abysmal, there has been nothing to stop the Individual Defendants from diverting whatever little cash flow is available to themselves through the unfair, excessive and self-dealing management agreements they entered into, essentially, with themselves.

**B.      BH REIT Distributions And Defendants' True Motivations**

57.     Since its inception, BH REIT has essentially been operated as a quasi-Ponzi scheme. Forbes.com Magazine ran an article titled "Unreal Returns" dated May 9, 2005 that focused on the operating performance of various REITs.  In regards to BH REIT, the article stated:

> Consider Behringer Harvard REIT I. This tiny Addison, Tex. outfit owns $200 million of interests in eight office buildings, including a handsome 24-story structure at 250 West Pratt Street in downtown Baltimore. The buildings produced $16.8 million in revenue for Behringer last year. After interest payments, taxes and property expenses, Behringer's FFO[1] stood at $586,000. It paid out a hefty $3.1 million in dividends.
>
> So of the 58 cents each share paid, only 11 cents came from the company's FFO. The remainder, admits Behringer Harvard, was cash raised from the company's investors.

*Unreal Returns*, Forbes.com, May 9, 2005 at 1.

58.     The same article states that Aisner "says his trust shouldn't be compared with established public REIT's because one-year old Behringer is only beginning...Aisner insists that the dividend deficit will narrow greatly as the REIT acquires more buildings this year."  *Id.* However, this was not to be the case.

59.     BH REIT offering documents state that "the amount of any future distributions will be based upon such factors as cash available or anticipated, current and projected cash requirements and tax considerations."  The offering documents also state that "our board of

---

[1] FFO is a financial measure used by REITs to define the cash flow generated by operations.

directors has and will continue to evaluate our distributions on at least a quarterly basis and depending upon the investment trends at this time, it may consider lowering our distribution rate for subsequent periods."  However, to promote sales, mask the performance of BH REIT and ensure that they continued to have ample funds from which to pay themselves exorbitant management fees, Defendants maintained distribution levels above what any reasonably commercial real estate investment trust could actually afford.  This allowed Defendants to attract new investors to BH REIT and to other Behringer Harvard REIT offerings.

60.     BH REIT has never been able to pay distributions from its Funds From Operations ("FFO") and has resorted to returning capital or borrowing to make distributions to shareholders.  The following chart illustrates year over year BH REIT distributions versus FFO.

| Year | FFO (millions) | Distributions (millions) | Coverage |
|------|---------------|--------------------------|----------|
| 2003 | $(0.23) | $0.05 | -467% |
| 2004 | $0.586 | $3.10 | 19% |
| 2005 | $18.4 | $22.40 | 82% |
| 2006 | $59.9 | $63.20 | 95% |
| 2007 | $108.9 | $114.00 | 95% |
| 2008 | $111.9 | $154.00 | 73% |
| 2009 | ($150.60) | $125.80 | -119% |
| 2010 | $11.3 | $56.9 | 19% |
| 2011 | $12.4 | $29.7 | 42% |

61.     Defendants hid the true value of the BH REIT shares and paid unjustified dividends in order to create a history of returns to shareholders that would appeal to future

investors.  Defendants intended to operate similar REITs and used the purported success of BH

REIT as a selling point for BH REIT II[2] and other similar real estate investment trusts including

Multifamily REIT I and multiple versions of the BH Opportunity REIT.   For example, the

registration statement for Multifamily REIT I assured investors that, "[a]s of December 31, 2006,

Behringer Harvard REIT I, Behringer Harvard Opportunity REIT I, Behringer Harvard Short-

Term Fund I and Behringer Harvard Mid-Term Fund I had raised approximately $1.5 billion of

gross offering proceeds from approximately 44,300 investors."   Behringer Harvard Multifamily

REIT I, Inc., Registration Statement (Form S-11) at 167 (December 31, 2007).   Investors were

also encouraged to invest in a variety of Behringer Harvard offerings, since an investment in the

Multifamily or Opportunity REIT "may complement an investment in Behringer Harvard REIT I

or Behringer Harvard REIT II, which are designed to be long-term, stable investments."   *Id.* at

26.  Defendants also emphasized their experience as Board Members and Officers of BH REIT I

to assure investors that they were highly qualified to manage new REITs.   In this manner, the

operating history of BH REIT I was leveraged to further the Individual Defendants' future

business goals and their acquisition of even greater management fees.

62.    To support this scheme, BH REIT distributions were unjustifiably paid out of

capital contributions and stock sales to new investors for as long as necessary to show that BH

REIT was purportedly a safe and sound investment to permit the closing of the subsequent REIT

offerings.   Tellingly, dividends to BH REIT shareholders were cut after the Defendants

bankrolled their next endeavor.  The payment of unsustainable dividends damaged BH REIT and

this management led to the decline in value of BH REIT.

63.    Thus, what Defendants have actually done is return capital to BH REIT I

investors and accrued debt that must be serviced out of future income and any investor proceeds,

---

[2] Now called Adaptive Real Estate Income Trust, Inc.

thereby limiting BH REIT's ability to acquire income-producing assets or to create real and sustainable profits and diluting BH REIT's shareholders' principal, contrary to the Company's stated investment objectives.  Defendants have effectively sought to mask the poor performance of BH REIT by paying investors back their own money while simultaneously draining the Company of millions of dollars in management fees for themselves.

64.     BH REIT's ability to cover its future distributions is equally unlikely.  In January and February 2012, the Company transferred ownership of two of its properties pursuant to foreclosure.  Additionally, on March 29, 2012, Behringer Harvard Opportunity REIT disclosed in an SEC filing that:

> On September 26, 2011, we, through a wholly-owned subsidiary of our operating partnership, entered into a lease agreement with Behringer Harvard REIT I, Inc., a real estate investment program sponsored by our sponsor Behringer Harvard Holdings LLC, to lease approximately 14,500 rentable square feet at Bent Tree Green to Behringer Harvard REIT I, Inc.

Behringer Harvard Opportunity REIT I, Inc., Annual Report (Form 10-K) at 81 (March 29, 2012).

65.     Put another way, Behringer Harvard Opportunity REIT, another struggling REIT in Defendants' portfolio, is receiving money from BH REIT to stay solvent.  This is not only a conflict of interest, but also highlights the fact that BH REIT is both lending money to its own REITs and moving investors' money around between its non-traded REITs.  This too is contrary to the Company's stated investment objectives and puts additional strain on BH REIT.  It is also a breach of the Board's fiduciary duties of loyalty.

66.     Moreover, BH REIT has incurred losses in each of its years in existence such that it was not required to pay out dividends to its investors in order to maintain its REIT status. Plus, Defendants have a conflict of interest and are incentivized for BH REIT to borrow funds to pay dividends and/or acquire properties using debt.  BH REIT pays Behringer Advisors "a debt

financing fee equal to 1% of any debt made available to" BH REIT.  Thus, to the extent BH REIT borrows funds, Behringer Advisors is compensated for that.

67.     In sum, the BH REIT Board has breached its fiduciary duties of care, good faith and loyalty to Plaintiffs and the Class by paying investors dividends despite that BH REIT is not generating sufficient cash flow to justify the payment of these dividends.  In addition, the Board has caused, or permitted, BH REIT to enter into extremely unfair management agreements with Behringer Harvard entities which directly benefit defendant Robert Behringer.  Each of these management agreements is a transaction between BH REIT and its controlling shareholder and is unfair to BH REIT and its investors.  They should be struck down and the excessive management fees should be returned to BH REIT.

### C.     The 2009 DRP Offering

### Arbitrary Pricing

68.     On January 5, 2009, the Company commenced a fourth public offering of up to 60 million shares of common stock offered at a price of $9.50 per share under its DRP pursuant to a Registration Statement on Form S-3 filed under the Securities Act.  This fourth public offering of BH REIT stock—which is ongoing—is currently expected to remain open until the earlier of January 5, 2014, or the date that the Company sells all $570 million worth of shares in the offering.

69.     The DRP shares were registered on a Form S-3 filed with the SEC on January 5, 2009.  The Form S-3 listed the selling price for the shares as $9.50 a share and incorporated by reference the Company's annual report for the year ended December 31, 2007, which stated in part as follows:

> ***Our board of directors arbitrarily determined the selling price of the shares to be issued under the DRP***, which is the same offering price as the shares issued

under our prior distribution reinvestment plan, and the price bears no relationship to our book or asset values, or to any other established criteria for valuing issued or outstanding shares. The selling price may not be indicative of the price at which the shares may trade if they were listed on an exchange or of the proceeds that a stockholder may receive if we liquidated or dissolved

*       *       *

There is no established public trading market for our common stock.  Therefore, there is a risk that a stockholder may not be able to sell our stock at a time or price acceptable to the stockholder.  Pursuant to the Current Offering, we are selling shares of our common stock to the public at a price of $10.00 per share and at $9.50 per share pursuant to our distribution reinvestment plan.  Unless and until our shares are listed on a national securities exchange, it is not expected that a public market for the shares will develop.

In order for Financial Industry Regulatory Authority ("FINRA") members and their associated persons to participate in the offering and sale of shares of common stock pursuant to our Current Offering, we are required pursuant to NASD Rule 2710(f)(2)(M) to disclose in each annual report distributed to stockholders a per share estimated value of the shares, the method by which it was developed and the date of the data used to develop the estimated value.  In addition, we prepare annual statements of estimated share values to assist fiduciaries of retirement plans subject to the annual reporting requirements of ERISA in the preparation of their reports relating to an investment in our shares. During our Offerings and for the first three full fiscal years following the termination of the last public equity offering of shares of our common stock; the value of the shares is deemed to be the offering price of $10.00 per share (without regard to purchase price discounts for certain categories of purchasers), as adjusted for any special distribution of net sales proceeds.  There is no public trading market for the shares at this time, and there can be no assurance that stockholders would receive $10.00 per share if such a market did exist and they sold their shares or that they will be able to receive such amount for their shares in the future.  Nor does this deemed value reflect the distributions that stockholders would be entitled to receive if our properties were sold and the sale proceeds were distributed upon liquidation of our company.  Such a distribution upon liquidation may be less than $10.00 per share primarily due to the fact that the funds initially available for investment in properties were reduced from the gross offering proceeds in order to pay selling commissions and dealer manager fees, organization and offering expenses, and acquisitions and advisory fees.

Behringer Harvard REIT I, Inc., Annual Report (Form 10-K) at 36 (March 31, 2008); Behringer Harvard REIT I, Inc., Registration Statement (Form S-3) at 4 (January 5, 2009).

70.     Although the Director Defendants disclosed that the Board "arbitrarily priced" the DRP shares, they misled investors by disclosing that, under FINRA rules, the Company was required to establish a "per share estimated value" of those shares.   Thus, the Director Defendants' implicit representation was that the $9.50 per share price was based on the estimates as required by FINRA.

71.     At the time BH REIT began to offer the DRP shares, however, the true value of the shares were far lower than $9.50 per share.   For example, in its 2009 Form 10-K filed with the SEC on March 18, 2010, BH REIT disclosed that it intended to conduct a valuation of its shares as of June 30, 2012, and admitted that "[d]ue to the continuing impact of the disruptions in the financial and real estate markets on the value of our investments, we expect that the estimated value per share of our common stock when determined will be less than $9.50 per share."   2009 Form 10-K at 9.

72.     In its 2009 Form 10-K, at page 54, BH REIT admitted:

[t]he current economic crisis which began with the collapse of residential subprime credit markets and continued through an overall crisis in, and freeze of, the credit markets toward the end of 2008, followed by unemployment and economic declines unprecedented in the last 70 years, has had severely negative effects across substantially all commercial real estate.   As the industry has been affected, other Behringer-Harvard sponsored investment programs that substantially completed their primary equity offerings at or prior to the end of 2008 have adversely affected by the disruptions to the economy generally and the real estate market.   These economic conditions have adversely affected the financial condition of many of these programs' tenants and lease guarantors, resulting in tenant defaults or bankruptcies.   Further, lowered asset values, as a result of declining occupancies, reduced rental rates, and greater tenant concessions and leasing costs, have reduced investor returns in these investment programs because these factors not only reduce current returns to investors but also negatively impact the ability of these investment programs to refinance or sell their assets and to realize gains thereon.

Behringer Harvard REIT I, Inc., Annual Report (Form 10-K) at 54 (March 18, 2010).

75.     Despite acknowledging the unprecedented decline in the real estate industry and its effect on real estate valuations, Defendants failed to re-price the DRP shares it sold to its investors.

76.     BH REIT also disclosed in its 2009 Form 10-K that it and its sister Behringer Harvard funds had similar investment objectives and may compete for properties.  BH REIT also disclosed in its 2009 Form 10-K that "[b]oth Berhringer Harvard Mid-Term Value Enhancement I and Behringer Harvard Short-Term Opportunity Fund I announced estimated valuations as of December 31, 2009, of $7.09 and $6.45 per unit, respectively, of their limited partner units. Behringer Harvard Opportunity REIT I announced estimated valuations of its common stock of $8.17 per share as of June 30, 2009, and $8.03 as of December 31, 2009."  *Id.* at 55. Thus, while other Behringer Harvard REITs share valuations were reduced by 20% to 35% from their sales price of $10 per share, Defendants nonetheless avoided seeking a true and realistic price for the BH REIT DRP shares despite knowing, or recklessly disregarding, that the BH REIT shares must have similarly declined along with its sister Behringer Harvard investment vehicles.

77.     Defendants' motives in not re-valuing the DRP shares to their proper valuation level is admitted in the 2009 10-K at p. 9: "The proceeds that we receive from participants choosing to reinvest distributions in additional shares has historically been an important source of capital to us.  To the extent that a material number of DRP participants choose to terminate or reduce their level of participation, our capital would be further constrained, and we would have to use a greater proportion of our cash on hand, cash flow from operations, or investing or financing activities to meet our general cash requirements, which would reduce cash available for distributions and could result in our board of directors further reducing or ceasing distributions."

78.     Although BH REIT did disclose that "the current offering price of shares under our DRP will likely exceed the price at which we offer shares under the DRP following an estimation of value of our shares of common stock" in its 2009 Form 10-K filed on March 18, 2010, Defendants did not make this disclosure to DRP investors in the DRP offering documents. Defendants' intentionally withheld this information from its investors in the DRP offering documents.  Plus, Defendants had a fiduciary obligation to fairly price the shares which were being offering to existing investors.

### Suspension of SRP Redemptions

79.     In March 2009, BH REIT suspended its shareholder redemption program ("SRP") under which shareholders could sell their shares back to the Company, other than for redemptions submitted in respect of a shareholder's death, disability or confinement to a long-term care facility (referred to herein as "exceptional redemptions").

80.     In the face of dire economic and market conditions in early 2009, the Company significantly curtailed redemptions (but continued sales under the DRP unabated). The Company announced the suspension of redemptions, other than exceptional redemptions, as follows in a letter to shareholders on March 31, 2009:

> Dear Shareholder:
>
> At its regularly scheduled end of the quarter meeting, the board of directors of Behringer Harvard REIT I, Inc. voted to (a) accept requests for redemption of the REIT's common stock made on circumstances of a shareholder's death, disability or need for long-term care, (b) reject all other pending redemptions (referred to as "ordinary" redemptions), (c) suspend the share redemption program in respect of ordinary redemptions until further notice and (d) continue to accept, until further notice, redemptions made on circumstances of a shareholder's death, disability or need for long-term care.
>
> In addition, the board determined that, given the uncertain and unusually volatile economic environment, future distributions will be determined and declared in

arrears rather than in advance of the period to which they apply.  As a result, distributions will be paid subsequent to the period to which they apply.  This is similar to the method used by listed REITs and other real estate operating companies that are no longer in their offering and acquisition phase.  This new distribution policy enables management and the board to make distribution decisions with greater visibility.  Lastly, the board is evaluating the merits and cost savings of moving from monthly to quarterly distributions and will make a determination in this regard at its May meeting.  The board will continue to monitor the REIT's performance and review its distribution policies with a focus on capital preservation and shareholder protection during this historically turbulent economic cycle.

In taking its actions in respect of redemptions, the board took into account that on an annual basis a detailed budget for the REIT's expenditures is created, which is continually monitored.  Budgeted expenditures for redemptions were based upon redemption rates throughout the REIT's six year operating history.  Requests for redemptions during the first quarter alone exceeded the full year's budgeted amount for redemptions.  Accepting redemptions of this magnitude could affect the REIT's ability to fulfill other funding obligations, including capital expenditures, tenant improvement costs and other operational expenditures budgeted to operate the company and would not allow it to take advantage of any investment opportunities that may be uniquely attractive in the current market environment.

Until now Behringer Harvard REIT I, Inc. has experienced a comparatively low level of redemptions relative to its competitors.  However several large competitor non-listed REITs have reached their limitations on share redemptions or have otherwise elected to suspend shareholder redemption requests.  We believe that this has caused substantial additional pressure for redemptions of shares of Behringer Harvard REIT I, Inc. as an available source of liquidity and management does not believe it fair for our shareholders to bear this disproportionate burden and the related potential negative consequences.

In addition, the REIT's board took into account that, given the crisis crippling the domestic and global economies, coupled with the virtual complete paralysis of the credit capital markets, proactive and protective measures to preserve the capital reserves of the REIT are advisable.  Furthermore, the REIT's board concluded that these proactive measures are prudent given that no one can accurately predict the length or severity of the recession or whether the currently weak economic environment will accelerate into a prolonged state of stagnation.

Behringer Harvard REIT I, Inc., Current Report (Form 8-K) at Ex. 99.1 (March 30, 2009).

81.     In spite of the fact that industry and market conditions had necessitated suspension of the SRP, the Company continued to sell shares pursuant to the DRP at the same $9.50 a share price it had sold shares at since February 2005 (when the U.S. economy and real estate markets were booming).  Despite adverse conditions and their significant negative impact on BH's business, the Company did not adjust the price for shares sold pursuant to the DRP.  In 2009, the Company sold a total of over 2.9 million shares of stock pursuant to the DRP at prices of $9.50 a share, raising proceeds of over $27 million.  The Company continued to sell shares under the DRP at $9.50 a share between January and May 2010.

D.      **BH REIT Acknowledges Low Share Value**

82.     In March 2010, the Company acknowledged that the value of its shares had indeed dropped due to the adverse economic market conditions that had prevailed since at least mid-2007:

> The current offering price of shares under our DRP likely exceeds the price at which we will offer shares under the DRP following an estimation of value of our shares of common stock.
>
> We intend to conduct a valuation of our shares of common stock in accordance with our valuation policy and determine the estimated value as of June 30, 2010. After determining the per share estimated value, the purchase price of the shares of common stock offered under our DRP will be equal to the per share estimated value.  Due to the continuing impact of the disruptions in the financial and real estate markets on the values of our investments, we expect that the estimated value per share of our common stock when determined will be less than $9.50 per share.

Behringer Harvard REIT I, Inc., Annual Report (Form 10-K) at 9, (March 18, 2010).

83.     However, through at least May 2010, the Company continued to sell shares through the DRP at what it had essentially acknowledged was an inflated price of $9.50 per share.

84.     On May 18, 2010, the Company announced its new estimated per-share price for

BH REIT stock as follows:

**Determination of Estimated Per Share Value**

On May 17, 2010, pursuant to our Second Amended and Restated Policy for Estimation of Common Stock Value (the "Estimated Valuation Policy"), our board of directors established an estimated per share value of the Company's common stock as of May 17, 2010 of $4.25.

As with any valuation methodology, our methodology is based upon a number of estimates and assumptions that may prove later to be inaccurate or incomplete. Further, different parties using different assumptions and estimates could derive a different estimated value per share, which could be significantly different from our board's estimated value per share. The estimated per share value determined by our board of directors neither represents the fair value according to GAAP of our assets less liabilities, nor does it represent the amount our shares would trade at on a national securities exchange or the amount a shareholder would obtain if he tried to sell his shares or if we liquidated our assets.

**Methodology**

Our board of director's objective in calculating an estimated value per share was to arrive at a value that it believes is reasonable and supportable using what the board of directors deems, after consultation with our advisor, Behringer Advisors, LLC (the "Advisor"), and an independent third party investment banking firm engaged by our Advisor, to be appropriate valuation methodologies under then current circumstances in accordance with the Estimated Valuation Policy. The following is a summary of the valuation methodologies used.

The Advisor estimated the current value of our real estate investments, debt obligations and other assets and liabilities primarily through the use of discounted cash flow analyses, which were initially prepared by the Advisor's asset management team and reviewed by both the Advisor's management and the independent third party investment banking firm. Both the Advisor and the third party investment banking firm employed a range of terminal capitalization rates, discount rates, growth rates and other variables consistent with the valuation of real estate assets based on their respective industry knowledge and experience. The third party investment banking firm arrived at its assumptions and valuation independent of the Advisor. At the May 17, 2010 board meeting, the Advisor made a recommendation that our board of directors adopt an estimated valuation of $4.25 per share, which was supported by the third party investment banking firm's independent valuation.

The board of directors believes that the valuation methodologies utilized are industry standard and acceptable valuation methodologies. The estimated values

for our investments in real estate may not represent current market values or fair values as determined in accordance with GAAP. Real estate is currently carried at its amortized cost basis in our financial statements, subject to any adjustments applicable under GAAP.

The estimated per share value does not reflect a liquidity discount for the fact that the shares are not currently traded on a national securities exchange, a discount for the non-assumability or prepayment obligations associated with certain of our debt, or a discount for our overhead and other costs that may be incurred, including any costs of any sale of our assets. The markets for commercial real estate can fluctuate and values are expected to change in the future.

Behringer Harvard REIT I, Inc., Current Report (Form 8-K) at 3-4 (May 18, 2010).

85.     After the Board finally engaged in a review of the valuation of the Company's shares, it knew and finally acknowledged that the share value was likely far lower than the $9.50 per share the Company was selling into the DRP. Nonetheless, the Company sold over $19 million worth of additional shares to shareholders under the DRP. The vast majority of sales under the DRP during the first half of 2010 were at the inflated price of $9.50 a share. The Company dropped the price for sales of stock pursuant to the DRP to $4.64 for its June 2010 sales of stock under the DRP.

86.     Defendants breached their duties of candor, loyalty and competence in selling the DRP shares at $9.50 per share. Defendants knew, or recklessly disregarded, that the shares sold pursuant to the DRP were overvalued and inflated, yet they continued to sell those shares to their existing shareholders in violation of their duty of candor.

E.      **The Proxy**

87.    On April 1, 2011, the Company filed its Definitive Proxy Statement on Schedule 14A pursuant to Section 14(a) of the Exchange Act (the "Proxy"), soliciting shareholder approval to amend and restate the Company's Charter.   The Company requested that shareholders approve a provision:

> requiring any person making a tender offer, including any "mini-tender" offer made for fewer than 5% of our outstanding securities, to comply with most of the provisions of Regulation 14D of the Securities Exchange Act of 1934, as amended (the "Exchange Act").   The board believes that the addition of this provision will further protect the Company and its stockholders by requiring any person or group seeking to tender for the Company's shares to provide substantial disclosure regarding its or their offer.

Behringer Harvard REIT I, Inc., Proxy Statement (Schedule 14A) at 5 (April 1, 2011).

88.    Defendants further stated that their first objective in pursuing the amended and restated charter was to "position the Company to pursue a liquidity event in the future."   The Liquidation is speculative, however, given that it may not occur until 2017 or possibly later depending upon future Board decisions.   Under the guise of generating liquidity for the Company's shareholders, Defendants pushed through a proposal that did not "protect" shareholders but rather protected themselves from losing control over the Company and made it more difficult for BH REIT's shareholders to exit their investments.   Despite this, an opportunity for liquidity became apparent in August 2011.   To thwart this threat on their control, the Defendants took more drastic measures.

**F.     The CMG Tender Offers**

**The August 23, 2011 CMG Tender Offer**

89.     On August 23, 2011, CMG Legacy Growth Fund and its affiliates ("CMG") filed

a Tender Offer Statement with the SEC on Schedule TO pursuant to Section 14(d)(1) or 13(e)(1)

of the Exchange Act, to purchase up to 1 million shares at $1.80 per share of BH REIT.

90.     In support of its tender offer, CMG's schedule TO stated, in pertinent part:

The REIT made the following statements in its Annual Report on Form 10-K for
the fiscal year ending December 31, 2010: "There is no established public
trading market for our common stock." The lack of any public market for the
sale of the Shares means that Shareholders have limited alternatives if they seek
to sell their Shares. As a result of such limited alternatives for Shareholders, the
Purchasers may not need to offer as high a price for the Shares as they would
otherwise. On the other hand, the Purchasers take a greater risk in establishing a
purchase price as there is no prevailing market price to be used for reference and
the Purchasers themselves will have limited liquidity for the Shares upon
consummation of the purchase. The Purchasers' review of independent
secondary market reporting publications such as The Stanger Report and The
Direct Investments Spectrum, reported sales of Shares on secondary markets at
$1.75-$3.25 during the Spring 2011 and Jan/Feb 2011 issues. The information
published by these independent sources is believed to be the product of their
private market research and does not constitute the comprehensive transaction
reporting of a securities exchange. Accordingly, the Purchasers do not know
whether the foregoing information is accurate or complete. Certain of the
Purchasers and/or their affiliates have purchased shares for approximately $1.5
per share in the recent past. The Purchasers are unaware of any other recent
trading prices.

The REIT previously had a Share Redemption Program in place, but that
program had been suspended since March 2009. Deceased shareholders may
redeem Shares at $4.55 per Share, up to $1,062,500 per quarter. It should be
noted that the Purchasers have not made an independent appraisal of the Shares
or the REIT's properties and are not qualified to appraise real estate.
Furthermore, there can be no assurance that the REIT's estimate accurately
reflects an approximate value of the Shares or that the actual amounts that may
be realized by Shareholders for the Shares may not vary substantially from this
estimate.

The Purchasers are offering to purchase Shares which are an illiquid investment
and are not offering to purchase the REIT's underlying assets. Accordingly, the

underlying asset value of the REIT is only one factor used by the Purchasers in arriving at the Offer Price.  The REIT has estimated the share value to be $4.55 per Share as of December 31, 2010.  It should be noted, however, that the Purchasers have not made an independent appraisal of the Shares or the REIT's properties, and are not qualified to appraise real estate.  Furthermore, there can be no assurance as to the timing or amount of any future REIT dividends, and there cannot be any assurance that the REIT's estimate accurately reflects an approximate value of the Shares or that the actual amounts which may be realized by holders for the Shares may not vary substantially from this estimate.

The Offer Price represents the price at which the Purchaser is willing to purchase Shares.  The Purchaser arrived at the $1.80 Offer Price by applying an approximate 60% liquidity discount to the Estimated Net Asset Value of the REIT's assets.  The Purchaser used a 18% discount because such a discount would meet the return targets based on the estimated time frame to potentially reach the Estimated Net Asset Value but nevertheless result in a significant number of shareholders choosing to sell.

91.    CMG's August 23, 2011 Offer represented a liquidity event for BH REIT shareholders.  Even though the tender price was relatively low, the August 23, 2011 offer still offered BH REIT shareholders an opportunity to get out of their investment prior to 2017.  The offer also created an opportunity for CMG to add to its preexisting holdings of 250,000 Company shares.  A single entity owning over 1 million shares represented a threat to Defendants' control and as a result they sought to dissuade BH REIT shareholders from tendering their shares.

**BH REIT Responds to the August 23, 2011 CMG Tender Offer**

92.    On September 7, 2011, BH REIT filed a Schedule 14D-9 Solicitation/Recommendation Statement with the SEC pursuant to Section 14(d)(4) of the Exchange Act ("Schedule 14D-9) responding to the August 23, 2011 CMG Tender Offer.

93.    The Schedule 14D-9 stated that the Board of Directors, the Director Defendants, unanimously recommended that the Company's shareholders, the Tender Offer Class, reject the

August 23 Tender Offer and not tender their shares for purchase.  The 14D-9 stated the following

reasons for why shareholders should reject the tender offer:

- The Board of Directors believes that the Offer Price is less than the current and potential long-term value of the shares of Common Stock, which belief is based on, among other things, the Board's December 31, 2010 estimated per share value of $4.55 (the "December Valuation"), which is $2.75 per share (153%) higher than the Offer Price.  The Company and the Board of Directors have not formally updated this estimate and do not intend to do so until December 31, 2011.  The Board of Directors also noted that, because the Company is an unlisted REIT, there is a limited market for the Common Stock and that there can be no certainty regarding the long-term value of the Common Stock because the value is dependent on a number of factors that may be difficult to predict and may be outside of the Company's control, including future economic conditions and the other factors referenced below in Item 8 – "Additional Information."

- The Board of Directors believes that the Offer Price represents an opportunistic attempt by the Bidders to purchase shares of Common Stock at a low price and make a profit for themselves, thereby depriving the Stockholders who tender shares of the potential opportunity to realize the long-term value of their investment in the Company. In this regard, the Board of Directors noted that the Bidders state in their Schedule TO that:

  o the Bidders are seeking to acquire the shares "for investment purposes";

  o the Bidders determined their Offer Price by applying a discount to their own estimated value of the net asset value of the Company's assets;

  o the Bidders did not offer any explanation or basis for the amount of the "illiquidity discount" they applied to the value of the Common Stock to reach their Offer Price, which Offer Price is only 40% of the December Valuation;

  o the Bidders believe that our Common Stock is worth more than the Offer Price; and

  o the Bidders note that shares of Common Stock have been traded in the secondary market for $3.25 per share, which is a price $1.45 higher (approximately 80% higher) than the Offer Price.

- The Company has recently been paying distributions at an annualized rate of $0.10 per share, which represents an annual yield of 2.2% per share based on the December Valuation and 5.5% per share based on the Bidders' Offer Price. Although the Board of Directors cannot provide any guarantee that the Company will maintain any particular rate of distributions or pay any distributions in the

future, Stockholders who choose to participate in the Tender Offer by selling their shares to the Bidders will lose the right to receive any future distributions.

94.     The Director Defendants specifically told shareholders that they should reject the tender offer because of the distributions that the Company had made.   What they failed to disclose is that, in reality, as described above, the Company was just paying back its shareholders the money that they originally invested.   Moreover, the lack of transparency of BH REIT as a nonpublic REIT enabled Defendants to assert that BH REIT's valuation was much higher than it actually was.   Defendants' overvaluation of BH REIT is supported by their own statement that the Company's common stock has traded in the secondary market for $3.25 per share, which is over  $1.30 per share less than Defendants' stated value of the Company's shares.   Thus, BH REIT shareholders were misled into not tendering in order to liquidate their investment.

## CMG's February 23, 2012 Tender Offer

95.     On February 23, 2012, CMG made a second tender offer by filing a Tender Offer Statement on Schedule TO with the SEC pursuant to Section 14(d)(4) of the Exchange Act, to purchase up to 1 million Company shares at $1.80 per share (the "February 23 CMG Tender Offer").  In support of its tender offer, CMG stated in pertinent part:

> The Purchasers have set the Offer Price at $1.80 per Share.  In determining the Offer Price, the Purchasers analyzed a number of quantitative and qualitative factors, including: (i) the lack of a formalized market for resale of the Shares and the resulting lack of liquidity of an investment in the REIT; (ii) the estimated value of the REIT's real estate assets; and (iii) the costs to the Purchasers associated with acquiring the Shares.
>
> The REIT made the following statements in its Annual Report on Form 10-K for the period ending December 31, 2010: "There is no established public trading market for our common stock.  Therefore, there is a risk that a stockholder may not be able to sell our stock at a time or price acceptable to the stockholder." The lack of any public market for the sale of Shares means that Shareholders have limited alternatives if they seek to sell their Shares. As a result of such limited alternatives for Shareholders, the Purchasers may not need to offer as high a price for the Shares as they would otherwise.  On the other hand, the Purchasers

take a greater risk in establishing a purchase price as there is no prevailing market price to be used for reference and the Purchasers themselves will have limited liquidity for the Shares upon consummation of the purchase. The Purchasers' review of independent secondary market reporting publications such as The Stanger Report and The Direct Investments Spectrum, reported sales of Units on secondary markets at $2.35-$3.00 during the Winter 2012 and sales of Units on secondary markets a $2.40-$2.95 per Unit in Nov./Dec. 2011, respectively. The information published by these independent sources is believed to be the product of their private market research and does not constitute the comprehensive transaction reporting of a securities exchange. Accordingly, the Purchasers do not know whether the foregoing information is accurate or complete.   Certain of the Purchasers and/or their affiliates have purchased shares for approximately $1.50 and $1.80 per share in the recent past. The Purchasers are unaware of any other recent trading prices.

The REIT previously had a Share Redemption Program in place, but that program has been suspended since March 2009.   Deceased & Disabled shareholders may redeem Shares at $4.64 per Share, up to $1,062,500 per quarter.   It should be noted that the Purchasers have not made an independent appraisal of the Shares or the REIT's properties and are not qualified to appraise real estate.   Furthermore, there can be no assurance that the REIT's estimate accurately reflects a realistic value of the Shares or that the actual amounts that may be realized by Shareholders for the Shares may not vary substantially from this estimate.

The Purchasers are offering to purchase Shares which are an illiquid investment and are not offering to purchase the REIT's underlying assets. The REIT's current articles require it to begin an orderly liquidation of assets if it has not listed the Shares by 2017, unless it decides not to (including a majority of the independent directors).   Accordingly, the underlying asset value of the REIT is only one factor used by the Purchasers in arriving at the Offer Price.   However, in the absence of significant trading price information, the REIT's estimate of the net asset value of the REIT may be relevant to Shareholders' review of the Offer Price. The REIT estimated that the Shares are worth approximately $4.64, up from $4.55 one year ago, based upon the estimated net asset value per share resulting from a valuation performed on its properties as of December 31, 2011, subject to the adjustments described in the Form 8-K filed December 28, 2011.

There can be no assurance, however, that the REIT's estimate accurately reflects an approximate value of the Shares or that the actual amounts that may be realized by Shareholders for the Shares may not vary substantially from this estimate.

**BH REIT Responds to the February 23, 2012 CMG Tender Offer**

96.     Despite stating that they had "thoroughly and carefully reviewed and analyzed the terms of the Tender Offer," the Defendants issued their response just one day after the latest CMG offer was announced.

97.     On February 24, 2012, BH REIT filed a Schedule 14D-9 Solicitation/Recommendation Statement with the SEC pursuant to Section 14(d)(4) of the Exchange Act (the "February Schedule 14D-9") responding to the February 23, 2012 CMG Tender Offer.

98.     The February Schedule 14D-9 stated that the Board of Directors, the Director Defendants, unanimously recommended that the Company's shareholders, the Tender Offer Class, reject the February 23, 2012 Tender Offer and not tender their shares for purchase.  The 14D-9 stated the following reasons why shareholders should reject the tender offer:

- The Board of Directors believes that the Offer Price is less than the current and potential long-term value of the shares of Common Stock, which belief is based on, among other things, the $4.64 estimated per share value of the Common Stock, as announced in the Company's Current Report on Form 8-K dated December 28, 2011 (the "2011 Valuation"), which is $2.84 per share (157%) higher than the Offer Price.  The Company and the Board of Directors have not formally updated this estimate and do not intend to do so until December 2012.  The Board of Directors also noted that, because the Company is an unlisted REIT, there is a limited market for the Common Stock and there can be no certainty regarding the long-term value of the Common Stock because the value is dependent on a number of factors that may be difficult to predict and may be outside of the Company's control, including future economic conditions and the other factors referenced in Item 8 – "Additional Information."

- The Board of Directors believes that the Offer Price represents an opportunistic attempt by the Bidders to purchase shares of Common Stock at a low price and make a profit for themselves, thereby depriving the Stockholders who tender shares of the potential opportunity to realize the long-term value of their investment in the Company.  In this regard, the Board of Directors noted that the Bidders state in their Schedule TO that:

- o the Bidders are seeking to acquire the shares "for investment purposes";

- o the Bidders determined their Offer Price by applying a discount to the Company's estimated per share value of the Common Stock;

- o the Bidders believe that the Common Stock is worth more than the Offer Price; and

- o the Bidders note that shares of Common Stock have been traded in the secondary market at "$2.35-$3.00 during the Winter 2012" and at "$2.40-$2.95 per Unit in Nov./Dec. 2011, respectively," which are prices that range from $1.20 higher (approximately 67% higher) to $0.55 higher (approximately 30% higher) than the Offer Price.

- Effective since May 2010, the declared distribution rate has been equal to a monthly amount of $0.0083 per share of Common Stock, which is equivalent to an annual distribution rate of 2.2% based on the 2011 Valuation and 5.5% per share based on the Bidders' Offer Price. Although the Board of Directors cannot provide any guarantee that the Company will maintain any particular rate of distributions or pay any distributions in the future, Stockholders who choose to participate in the Tender Offer by selling their shares to the Bidders will lose the right to receive any future distributions, including any distributions made or declared after the expiration date of the Tender Offer.

99.     Again, the Director Defendants sought to dissuade BH REIT's shareholders from tendering by highlighting the distributions of the Company, and again Defendants assert that BH REIT's valuation is much higher than it actually is.

100.    Typical investors of BH REIT purchased shares believing it was a safe and secure investment due to the Defendants' representations regarding its investment objectives and valuation.  Given the nature of a non-public REIT, BH REIT's investors had no choice but to rely upon Defendants' representations.  Defendants took advantage of that reliance and actively and affirmatively concealed material underlying facts concerning BH REIT's properties and the performance of the REIT to its shareholders.  Once again, BH REIT shareholders were denied a real opportunity to liquidate their investment, albeit at a lower than desired price, prior to 2017.

<u>COUNT I</u>
**(Against the Individual Defendants for Breach of the Fiduciary Duty of Loyalty)**

101.    Lead Plaintiffs repeat and re-allege each of the allegations set forth above as if fully set forth herein.

102.    The Individual Defendants comprise BH REIT's Directors and Officers and each owed Plaintiffs and Class members a duty to act in the best interests of BH REIT and not their own personal interests.   The Individual Defendants had a fiduciary duty to deal fairly with Plaintiffs and Class members and to communicate promptly to them all material facts they knew or should have known about the true nature of the investments in BH REIT.

103.    The Individual Defendants breached their duty of loyalty to Plaintiffs and the class by declaring and causing BH REIT to pay dividends to investors that were not supported by BH REIT's profitability.   Defendants also breached their duty of loyalty by agreeing to the Advisory Agreement.   The Individual Defendants caused BH REIT to enter into the Advisory Agreement and to pay dividends from borrowed funds or newly invested capital for the purpose of making BH REIT appear to be a safe, secure and well-performing REIT.   Defendants also caused BH REIT to borrow excessive funds so that Behringer Advisors would earn a 1% fee on all such debt.   By creating this impression, Behringer, and the Behringer Harvard entities he controlled, could market and sell additional REIT offerings and earn almost $182 million in selling fees, commissions and additional management fees.   The Advisory Agreement was admittedly not negotiated at arms-length and was unfair to BH REIT investors and has resulted in an unfair windfall to Behringer Advisors.

104.    In addition, the Individual Defendants breached their duty of loyalty by misleading investors regarding the nature and accuracy of the CMG Tender Offers, and the realistic possibility of future liquidation opportunities.   In suggesting that the CMG Offers were

inadequate, the Defendants cited to the share price set by their own Board and suggested that the consistency of dividend payments was a reason to continue to hold BH REIT shares.  Defendants did not explain that the dividends were unjustified in light of the actual operating revenues of the REIT, or that the share price was inflated and unsustainable in light of BH REIT's borrowing practices.  Finally, the Individual Defendants breached their duty of loyalty by continually referring to a Liquidation event as a better alternative for investors when the logistics of the Liquidation were not yet planned and the financial benefit of Liquidation was even less certain due to the debt incurred in paying unjustified distributions.

105.   The Individual Defendants breached their duty of loyalty to Plaintiffs and the class by mismanaging BH REIT and causing it to enter into unfair agreements with Behringer Harvard Holdings or Behringer Advisors and other entities owned and controlled by Behringer. The Individual Defendants caused BH REIT to fail to manage its properties and finances as promised, to "preserve, protect and return [investor's] capital contributions, to maximize cash distributions paid to [investors], to realize growth in the value of our investments upon our ultimate sale of such investments; and to list our shares for trading on a national securities exchange...."  The Individual Defendants further claimed to "anticipate that a minimum of 83% of the proceeds from the sale of shares will be used to acquire real estate properties and the balance will be used to pay various fees and expenses and establish reserves for working capital."  Instead, the Individual Defendants mismanaged BH REIT by declaring dividends without a sufficient level of profitability so that BH REIT would appear as a safe and well-performing REIT, allowing Behringer to sell shares in new REITs and pocket tens of millions of dollars in additional selling commissions and management fees.

## COUNT II
### (Against the Director Defendants for Breach of the Fiduciary Duty of Candor)

106.    Lead Plaintiffs repeat and re-allege each of the allegations set forth above as if fully set forth herein.

107.    This Count is asserted on behalf of those Class members who purchased or otherwise acquired shares in BH REIT through the DRP between January 5, 2009, and April 30, 2010.

108.    The Director Defendants by virtue of their positions with the Company owed Plaintiffs and the Class a fiduciary duty to exercise a high degree of due care, loyalty, good faith and candor in the management and administration of the affairs of BH REIT.    In particular, the Director Defendants owed Lead Plaintiffs Class, as shareholders, a duty at all times to act in good faith and based on being reasonably informed of the facts relevant to their acts as Directors.

109.    The Director Defendants breached these fiduciary duties to Plaintiffs and the Class by, *inter alia*, setting the price at which BH REIT sold shares to existing shareholders pursuant to the DRP at an inflated and completely arbitrary level and, prior to May 2010, without taking any reasonable steps to inform themselves as to a fair value for BH REIT shares, as more fully alleged above.   The Director Defendants also breached their duty of candor by misleadingly suggesting that the shares were valued in accordance with the rules of FINRA when, in fact, they were not.

110.    As a direct and proximate result of the Director Defendants' breaches of their fiduciary duty, Plaintiffs and the Class members have been injured in their property and have suffered and continue to suffer economic and non-economic losses, in an amount to be determined at trial.

## COUNT III
**(Against the Director Defendants for Violations of Section 14(e) and Rule 14e-2(b))**

111.    Lead Plaintiffs repeat and re-allege each of the allegations set forth above as if fully set forth herein.

112.    This Count is asserted under § 14(e) of the Exchange Act and Rule 14e-2(b) promulgated thereunder on behalf of Class members who were entitled to tender their shares pursuant to the CMG Tender Offers and who suffered harm as a result of the Director Defendants' actions and violations of Section 14(e) of the Exchange Act for issuing materially false and misleading Schedule 14D-9 Solicitation/Recommendation statements on September 7, 2011, and February 24, 2012, against the Director Defendants.  Section 14(e), 15 U.S.C. §78n(e), states that it is "unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading or to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer or request or invitation for tenders, or any solicitation of security holder in opposition to or in favor of any such offer, request, or invitation. The Commission shall, for the purposes of this subsection, by rules and regulations define, and prescribe means reasonably designed to prevent, such acts and practices as are fraudulent, deceptive, or manipulative."   SEC Rule 14e-2(b), 17 C.P.R. § 240.14e-2(b), requires that with respect to a tender offer, when a material change occurs in the disclosure recommending acceptance or rejection of a tender offer, "the subject company shall promptly publish or send or give a statement disclosing such material change to security holders."

113.    In the Schedule 14D-9s filed by the Director Defendants on September 7, 2011, and on February 24, 2012, the Board recommended that shareholders reject the August 23 and

September 7 CMG Tenders based upon the valuation of the Company and the distributions  the Company  has paid in the past.  The Director Defendants violated § 14(e) of the Exchange Act and Rule 14e-2(b) promulgated thereunder by: by failing to state material facts necessary in order to make the statements made in the Schedule 14D-9s not misleading.  The Schedule 14D-9 failed to disclose material facts that about the value of the Company's stock and that FFO of the Company has never been sufficient to cover its distributions.

114.    As a result of this wrongdoing, Lead Plaintiffs and members of the Tender Offer Class are threatened with irreparable injury, for which there is no adequate remedy at law, as well as substantive economic damages.

**COUNT IV**
**(Against the Director Defendants for Violations of Section 14(a) and Rule 14a-9)**

115.    Lead Plaintiffs repeat and re-allege each of the allegations set forth above as if fully set forth herein.

116.    This Count is asserted under § 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder on behalf of Class members who were BH REIT shareholders of record as of April 1, 2011, and were entitled to vote on the Schedule 14A filed with the SEC on April 1, 2011, and their heirs, successors, and assigns who suffered harm as a result of the Director Defendants actions and violations of Section 14(a) of the Exchange Act for materially false and misleading Proxy, against the Director Defendants.  Section 14(a) of the Exchange Act, 15 U.S.C. §78n(a), prohibits any person soliciting a proxy from doing so "in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."  SEC Rule 14a-9, 17 C.P.R. § 240.14a-9, promulgated pursuant to Section 14(a), prohibits the issuance of any proxy statement "which, at the time and in the light of the circumstances under which it is made, is

false and misleading with respect to any material fact, or which omits to state any material fact necessary to make the statements therein not false and misleading."

117.    The Director Defendants violated § 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder by:

(a)    Making untrue statements of material fact in the Proxy by failing to state material facts necessary in order to make the statements made in the Proxy, in the light of the circumstances under which they were made; and

(b)    Failing to promptly publish or send or give a statement disclosing a material change to shareholders with respect to the Proxy, when a material change occurred.

118.    The Proxy stated that the first objective of amending and restating the Company's charter was "to position the Company to pursue a liquidity event in the future" and that the proposal with regard to tender offers was necessary to "protect" the Company's stockholders.

119.    Because information regarding a listing of the Company's stock on a national stock exchange and the value of a Company's stock is material information, the Proxy is rendered false and misleading by making statements and omitting material facts about the Liquidation and Defendants' ulterior motives regard potential tender offers which effectively misled and induced the majority of shareholders to approve the Proxy.   Such material information was never disclosed in the Proxy or a supplement thereto.  This information would have altered the total mix of information made available to the shareholders when determining whether to approve the Proxy, and was therefore material to the shareholders.

120.    By reason of the foregoing, the Proxy is materially false and misleading, in violation of Section 14(a) of the Exchange Act and the rules and regulations promulgated thereunder.

121.    None of the Director Defendants named in this Count made a reasonable investigation or possessed reasonable grounds for the belief that the statements made in the Proxy were true, without omissions of any material facts, and not misleading.  The Director Defendants named in this Count are liable under Section 14(a) of the Exchange Act for the following reasons:

(a)    The Director Defendants, as directors and/or officers of BH REIT, allowed their names to be used in the false and misleading Proxy, in connection with the solicitation of votes regarding the matters to be voted upon in the Proxy, and affirmatively recommended in the Proxy that shareholders vote in favor of all of the proposals contained in therein;

(b)    The Director Defendants allowed their names to be used in connection with the solicitation of votes regarding the matters to be voted upon in the Proxy and allowed a description of their backgrounds and other relevant information to be used in the Proxy. The use of their names was not incidental, but rather material in connection with the solicitation of votes regarding all of the matters to be voted upon in the Proxy, including, but not limited to, their standing for election as directors of BH REIT.  The use of their names lent substantial and material support to the other matters to be voted upon and which were recommended for affirmative action by BH REIT's Board of Directors; and

(c)    The Director Defendants, directly, or through the employ of others, solicited votes for the matters to be voted upon in the Proxy and caused the Proxy to be disseminated to the Proxy Class through the use of the United States mails and the means and instrumentalities of interstate commerce.

122.     As a result of this wrongdoing, the members of the Proxy Class are threatened with irreparable injury, for which there is no adequate remedy at law.

## COUNT V
### (Against All Defendants for Unjust Enrichment)

123.     Lead Plaintiffs repeat and re-allege each of the allegations set forth above as if fully set forth herein.

124.     By their wrongful acts and omissions, Defendants were unjustly enriched at the expense of and to the detriment of Plaintiff and the proposed class.

125.     Lead Plaintiffs, as shareholders of BH REIT, seek restitution from Defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by them from their wrongful conduct and fiduciary breaches.

## PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiffs, on their own behalf and on behalf of the Class, pray for judgment as follows:

A.     Ordering that this action may be maintained as a class action and certifying the Class as set forth herein and designating Lead Plaintiffs as the Class representatives;

B.     Declaring the Proxy to be materially false and misleading in violation of Section 4(a) of the Securities Exchange Act of 1934;

C.     Declaring the 14D-9 Solicitation/Recommendation Statements filed on September 7, 2011 and February 24, 2012 to be materially false and misleading in violation of Section 14(3) of the Securities Exchange Act of 1934;

D.     Declaring the conduct of the Defendants to be in violation of law as set forth herein;

E.  Declaring any authorizations secured by Defendants pursuant to the false and misleading Proxy, null and void, and requiring that any re-solicitation of shareholder votes shall be pursuant to Court supervision and Court-approved proxy materials;

F.  Declaring that Defendants have violated their fiduciary duties to the shareholders who purchased shares of BH REIT from February 19, 2003 to the present;

G.  Directing Defendants to account to Lead Plaintiffs and the Class for their damages sustained because of the wrongs complained of herein;

H.  Awarding Plaintiff the costs of this action, including reasonable allowance for Plaintiffs attorneys' and experts' fees; and

I.  Granting such other and further relief as this Court may deem just and proper.

## JURY TRIAL DEMAND

Lead Plaintiffs hereby demand a trial by jury.


Dated:   February 1, 2013

Respectfully submitted,

*/s/ Roger L. Mandel*
ROGER L. MANDEL
State Bar No. 12891750
LACKEY HERSHMAN, L.L.P.
3102 Oak Lawn Avenue, Suite 777
Dallas, Texas 75219
Phone: (214) 560-2201
Fax:    (214) 560-2203
rlm@lhlaw.net


BLOCK & LEVITON LLP
Jeffrey C. Block (*pro hac vice*)
Scott A. Mays (*pro hac vice*)
Leigh E. O'Neil
155 Federal Street, Suite 1303
Boston, MA 02110
Telephone: (617) 542-8300
Facsimile: (617) 542-1194

Counsel for Lead Plaintiffs and for the Class


## Certificate of Service

On the 1st day of February, 2013, the foregoing Consolidated Amended Class Action Complaint was electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all parties of record.

*/s/ Roger L. Mandel*
Roger L. Mandel