UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| LILLIAN HOHENSTEIN, Individually, and on behalf of all others similarly situated, ET AL., | ) ) ) | |
| | ) | CIVIL ACTION NO. |
| Plaintiffs, | ) | |
| | ) | 3:12-CV-3772-G |
| VS. | ) | |
| | ) | |
| BEHRINGER HARVARD REIT I, INC., ET AL., | ) ) | |
| | ) | |
| Defendants. | ) | |
| THOMAS NELSON and VINCENT VALADEZ, on behalf of all others similarly situated, | ) ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | CONSOLIDATED WITH |
| VS. | ) | |
| | ) | 3:12-CV-4842-G |
| BEHRINGER HARVARD REIT I, INC., ET AL., | ) ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Before the court is the defendants' motion to dismiss the plaintiffs' amended

complaint (docket entry 45).  For the reasons stated below, the motion is granted.

## I. <u>BACKGROUND</u>

### A. <u>Factual Background</u>

This is a securities class action.  It was brought by several plaintiffs on behalf of all persons and entities that purchased or otherwise acquired shares of Behringer Harvard REIT I.  *See* Consolidated Amended Class Action Complaint ("Complaint") ¶ 2 (docket entry 41).  A real estate investment trust, or REIT, is an investment vehicle that allows individual investors to purchase shares in a diverse portfolio of real estate, which is managed by the REIT.  See *id.* ¶ 4; Defendants' Memorandum of Law in Support of Motion to Dismiss Amended Complaint ("Motion") at 2 (docket entry 46).  Behringer Harvard REIT I, Inc. ("BH REIT") was incorporated by the investment firm Behringer Harvard in Maryland in 2002.  *Id.*; Complaint ¶ 24.  The plaintiffs allege that defendant Behringer Holdings, LLC is the parent company of BH REIT.  Complaint ¶¶ 25-26.  The other defendants, Robert Behringer, Robert Aisner, Steven Partridge, Ronald Witten, and Charles Dannis are members of BH REIT's board of directors.  Complaint ¶¶ 27-32.  Partridge, Witten, and Dannis are independent directors on that board, with no other material connection to BH REIT. *See* Motion at 2.

BH REIT started as a non-traded REIT, meaning that it was not listed on any public exchange markets.  Complaint ¶ 4.  Instead, investors purchased shares with an eye to selling them in a future liquidation event.  *Id.*  In the case of BH REIT, the

liquidation event was scheduled for 2017.  *Id.* ¶ 5.  In the meantime, BH REIT paid investors regular distributions.  *Id.* ¶ 12.  If shareholders wished to sell their shares before the liquidation event, they had to do so through an "inefficient secondary market."  *Id.* ¶ 4.  Until 2009, investors could also sell shares back to BH REIT through a shareholder redemption program.  *Id.* ¶ 79.

In January 2009, BH REIT began a Distribution Reinvestment Program ("DRP"), through which shareholders could purchase additional shares of the REIT. *Id.* ¶ 9.  In its previous offerings, most shares of the REIT were offered at a price of $10 per share, with a smaller number of shares sold at $9.50 per share.  *Id.* ¶ 7. During the DRP, shares were sold to the public at $10 per share, but current shareholders could purchase shares through the DRP for $9.50 per share.  See *id.* ¶ 69.  In the Registration Statement that accompanied the DRP, BH REIT acknowledged that:

> Our board of directors arbitrarily determined the selling price of the shares to be issued under the DRP, which is the same offering price as the shares issued under our prior distribution reinvestment plan, and the price bears no relationship to our book or asset values, or to any other established criteria for valuing issued or outstanding shares.

*Id.*; Motion at 6.  There was also an exculpation provision in the Registration Statement that stated:

> Neither we nor any of our officers, directors, agents or employees will have any responsibility or liability as to the value of our shares, any change in the value of the shares

> acquired for each participant's account, or the rate of
> return earned on, or the value of, the interest-bearing
> accounts, if any, in which distributions are invested.
>
> In addition, neither we nor any of our officers, directors,
> agents or employees will be liable under the DRP for any
> act done in good faith, or for any good faith omission to
> act . . .

*Id.* at 4.

In February 2009, the Financial Industry Regulatory Authority, or FINRA,

passed a new regulation that required FINRA members to update estimated

investment values eighteen months after the close of an investment offering.  *Id.* at 6.

In compliance with the FINRA regulation, BH REIT continued to price its DRP

shares at $9.50 until May 17, 2010, when it revalued the shares at $4.25 per share.

See *id.* at 6-7; Complaint ¶ 84.  BH REIT then set the DRP price to match that new

valuation.  Motion at 7.

In April 2011, BH REIT issued a proxy statement to its shareholders,

requesting that they vote on several amendments to the BH REIT charter.  See *id.* at

8-9; Complaint ¶ 14.  In the proxy statement, the directors of BH REIT stated that

one objective of the amendments was to take a number of measures "to position the

Company to pursue a liquidity event in the future."  Exhibit 7 to Appendix to

Defendants' Memorandum of Law in Support of Motion to Dismiss Amended

Complaint ("Defendants' Appendix") at 5 (docket entry 47-1).  Another objective of

the amendments was to regulate future mini-tender offers, or offers made to purchase

- 4 -

less than 5% of the outstanding shares of BH REIT.  Motion at 8-9.  The

amendments would require any party seeking to make a mini-tender offer to make

the same sorts of disclosures required of normal tender offerors.  See *id.* at 9.

Regarding these amendments, the directors stated in the proxy statement that:

> We believe that these mini-tender offers are potentially
> harmful to our stockholders, as they are not subject to the
> filing, disclosure and procedural requirements established
> by the SEC for formal tender offers.  In addition,
> responding to these mini-tender offers can be both costly
> and time consuming for the Company.  We believe that
> the addition of Section 12.2 will further protect the
> Company and its stockholders by requiring any person or
> group seeking to tender for the Company's shares to
> provide substantial disclosure regarding its or their offer.

Exhibit 7 to Defendants' Appendix at 26.  When the proposed amendments were

taken up at BH REIT's annual meeting, over 90% of represented shares voted to

approve them.  Motion at 9.

After the amendments were passed, in August 2011 and February 2012, CMG

Legacy Growth Fund ("CMG") made offers to purchase one million shares

(approximately 0.34% of the outstanding shares) of BH REIT at a price of $1.80 per

share.  Complaint ¶¶ 89, 95.  BH REIT valued its shares at $4.55 and $4.64 at those

times, respectively.  Complaint ¶¶ 93, 98.  CMG acknowledged that its $1.80 offer

price was reached "by applying an approximate 60% liquidity discount to the

Estimated Net Asset Value of the REIT's assets" for the August 2011 offer.

Complaint ¶ 90.  The February 2012 offer was discounted by 39%.  Motion at 10.

CMG also disclosed that it intended to hold onto the shares until a liquidation event

in hopes of recovering the "full Estimated Net Asset Value." *Id.* (quoting Exhibit 11

to Defendants' Appendix at 8; Exhibit 12 to Defendants' Appendix at 12).

BH REIT filed Schedule 14D-9 Solicitation/Recommendation Statements with

the SEC in response to each of CMG's tender offers.  Complaint ¶¶ 92, 97.  In those

statements, the directors of BH REIT advised shareholders not to accept the tender

offers due to their low value and because they felt that CMG was trying to make a

profit at the expense of BH REIT's shareholders.  See *id.* ¶¶ 93, 98.  The directors also

pointed out that even on the secondary market, shares of BH REIT were trading for

significantly more than CMG's offer price.  See *id.*  Lastly, the board stated that:

> Although the board of directors cannot provide any
> guarantee that the Company will maintain any particular
> rate of distributions or pay any distributions in the future,
> Stockholders who choose to participate in the Tender Offer
> by selling their shares to the Bidders will lose the right to
> receive any future distributions, including any distributions
> made or declared after the expiration date of the Tender
> Offer.

*Id.*  The Schedule 14D-9 statements incorporated by reference the Form 10-K that

BH REIT had filed with the SEC in 2011.  *See* Exhibit 13 to Defendants' Appendix at

5; Exhibit 14 to Defendants' Appendix at 5.  The 2011 Form 10-K had disclosed that

"[h]istorically, the amount of our declared distributions has exceeded our cash flow

from operating activities," and that "all or a portion of our distributions" had been

paid "from the proceeds of our final offering or from borrowings."  *See* Exhibit 9 to

Defendants' Appendix at 11, 36.  The fact that distributions were not necessarily paid from cash flow had also been disclosed in BH REIT's previous prospectuses that accompanied each share offering.  *See* Exhibit 1 to Defendants' Appendix at 115; Exhibit 2 to Defendants' Appendix at 35; Exhibit 3 to Defendants' Appendix at 120.

## B.  Procedural Background

Initially, shareholders of BH REIT filed two separate lawsuits against the company.  *See* Class Action Complaint (docket entry 1); Class Action Complaint (docket entry 1 of 3:12-CV-4842-G).  On January 4, 2013, the court consolidated those two cases into this one.  *See* Order Consolidating Cases (docket entry 39).  The combined plaintiffs then filed a consolidated amended complaint, bringing claims for breach of fiduciary duty of loyalty, breach of fiduciary duty of candor, violations of Section 14(e)/Rule 14e-2(b) and Section 14(a)/Rule 14a-9 of the Exchange Act, and unjust enrichment.  *See generally* Complaint.

On March 1, 2013, the defendants filed a motion to dismiss the plaintiffs' claims.  *See* Defendants' Motion to Dismiss Amended Complaint (docket entry 45). Plaintiffs filed a response, *see* Lead Plaintiffs' Response to Defendants' Motion to Dismiss and Supporting Memorandum ("Response") (docket entry 52), and the defendants filed a reply in support of their motion.  *See* Defendants' Reply in Further Support of Motion to Dismiss Amended Complaint ("Reply") (docket entry 55).  The motion is now ripe for decision.

- 7 -

## II. ANALYSIS

### A. Rule 12(b)(6) Standard

"To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead 'enough facts to state a claim to relief that is plausible on its face.'" *In re Katrina Canal Breaches Litigation*, 495 F.3d 191, 205 (5th Cir. 2007) (quoting *Bell Atlantic Corporation v. Twombly*, 550 U.S. 544, 570 (2007)), *cert. denied*, 552 U.S. 1182 (2008). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (citations, quotation marks, and brackets omitted). "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *In re Katrina Canal*, 495 F.3d at 205 (quoting *Twombly*, 550 U.S. at 555) (internal quotation marks omitted). "The court accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff." *Id.* (quoting *Martin K. Eby Construction Company, Inc. v. Dallas Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir. 2004)) (internal quotation marks omitted).

The Supreme Court has prescribed a "two-pronged approach" to determine whether a complaint fails to state a claim under Rule 12(b)(6). See *Ashcroft v. Iqbal*,

556 U.S. 662, 678-79 (2009).  The court must "begin by identifying the pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth."  *Id.* at 679.  The court should then assume the veracity of any well-pleaded allegations and "determine whether they plausibly give rise to an entitlement of relief."  *Id.*  The plausibility principle does not convert the Rule 8(a)(2) notice pleading to a "probability requirement," but "a sheer possibility that a defendant has acted unlawfully" will not defeat a motion to dismiss.  *Id.* at 678.  The plaintiffs must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged -- but it has not 'show[n]' -- 'that the pleader is entitled to relief.'"  *Id.* at 679 (alteration in original) (*quoting* FED. R. CIV. P. 8(a)(2)).  The court, drawing on its judicial experience and common sense, must undertake the "context-specific task" of determining whether the plaintiffs' allegations "nudge" their claims against the defendants "across the line from conceivable to plausible."  See *id.* at 679, 683.

## B.  Breach of Fiduciary Duty

The plaintiffs initially brought claims for breach of the fiduciary duties of loyalty and candor.  *See* Complaint ¶¶ 101-110.  After the defendants filed their motion to dismiss, the plaintiffs conceded that their breach of fiduciary duty of

loyalty claim was likely barred by statute, as it would have to be brought either by BH REIT itself or as a shareholder derivative suit.  *See* Response at 1 n.1.  However, the plaintiffs also asserted that their second claim was not restricted to breach of fiduciary duty of candor alone, but encompassed breaches of the duties of due care, good faith, and -- somewhat confusingly, considering they conceded dismissal of their breach of fiduciary duty of loyalty claim -- loyalty.  *See* Response at 11 & n.3.  The plaintiffs claim that BH REIT's board of directors breached these fiduciary duties by pricing shares at $9.50 per share during the DRP "without taking any reasonable steps to inform themselves as to a fair value for BH REIT shares," and by "misleadingly suggesting that the shares were valued in accordance with the rules of FINRA."  *See* Complaint ¶ 109.  The court concludes that the plaintiffs have failed to state a claim for any of these fiduciary duty causes of action.  Their breach of fiduciary duty claim must therefore be dismissed.

1. *Legal Standards*

In Maryland,[1] the duties of directors of financial institutions have been set down in statute.  Section 2-405.1(a) of Maryland's Corporations and Associations Code states that:

---

[1]    The court will apply the law of Maryland because the laws of the state in which a corporation was incorporated govern "the rights, powers, and duties of its board of directors and shareholders and matters relating to its shares."  See *Hollis v. Hill*, 232 F.3d 460, 464-65 (5th Cir. 2000) (internal quotation omitted).

> (a) A director shall perform his duties as a director, including his duties as a member of a committee of the board on which he serves:
>
> > (1) In good faith;
> >
> > (2) In a manner he reasonably believes to be in the best interests of the corporation; and
> >
> > (3) With the care that an ordinarily prudent person in a like position would use under similar circumstances.

MD. CODE, CORPS. & ASS'NS § 2-405.1(a).  As the plaintiffs concede, the Maryland code also specifies that "[n]othing in [section 2-405.1] creates a duty of any director of a corporation enforceable otherwise than by the corporation or in the right of the corporation."  MD. CODE, CORPS. & ASS'NS § 2-405.1(g).  The Court of Appeals of Maryland, Maryland's highest court, has recognized that "the language of subsection (g) . . . plainly means that, to the extent § 2-405.1 creates duties on directors such as the duty of care contained in § 2-405.1(a), those duties are enforceable only by the corporation or through a shareholders' derivative action."  *Shenker v. Laureate Education, Inc.*, 983 A.2d 408, 426 (Md. 2009).

If the plaintiffs were bringing a derivative action, they would have to surmount the business judgment rule as codified in section 2-405.1(a).  In Maryland, "there is a presumption that directors of a corporation acted in good faith and in the best interest of the corporation."  *Wittman v. Crooke*, 707 A.2d 422, 425 (Md. Ct. Spec. App. 1998); see also *Werbowsky v. Collomb*, 766 A.2d 123, 138 (Md. 2001) ("Absent

an abuse of discretion, [a director's] judgment will be respected by the courts."). To rebut that presumption, a plaintiff must allege "more than mere suspicions and must state a claim in particular, rather than conclusory terms." *Bender v. Schwartz*, 917 A.2d 142, 152-53 (Md. Ct. Spec. App. 2007). In other words, a plaintiff must make allegations that clearly show that a director did not act "[i]n good faith," "[i]n a manner he reasonably believes to be in the best interests of the corporation," or "[w]ith the care that an ordinarily prudent person in a like position would use under similar circumstances." *See* MD. CODE, CORPS. & ASS'NS § 2-405.1(a).

Maryland has recognized one limited duty outside of those laid down in section 2-405.1(a). In *Shenker v. Laureate Education, Inc.*, the court found that when a corporation's directors chose to sell the corporation, they "owed fiduciary duties of candor and maximization of shareholder value to [the shareholders], common law duties not encompassed or superseded by § 2-405.1(a)." 983 A.2d at 422. *Shenker* has been interpreted to mean that when directors are selling a corporation, they are not acting within their "managerial" capacities, and thus owe duties beyond the managerial duties imposed by section 2-405.1. See *Becker v. Inland American Real Estate Trust, Inc.*, No. 13 C 3128, 2013 WL 6068793, at *4 (N.D. Ill. Nov. 18, 2013); *George Wasserman & Janice Wasserman Goldsten Family LLC v. Kay*, 14 A.3d 1193, 1213 (Md. Ct. Spec. App. 2011) ("because the directors [in *Shenker*] were acting outside of their normal managerial duties, they were not protected by . . .

§ 2-405.1 and, thus, were subject to direct common law duties of candor and good faith owed to the shareholders").  To date, *Shenker*'s holding has been limited to its narrow set of circumstances, and courts have not imposed a fiduciary duty of candor in other situations.  See *Kay*, 14 A.3d at 1213; *Stender v. Cardwell*, No. 07-CV-02503-REB-MJW, 2010 WL 1930260, at *4 (D. Colo. May 12, 2010) ("The duties of candor and maximization of value that directors directly owe to shareholders recognized in *Shenker* arise in a very narrow context -- specifically, that of a cash-out merger when the decision to sell the corporation already has been made."); *Consortium Atlantic Realty Trust, Inc. v. Plumbers & Pipefitters National Pension Fund*, No. 365879-V, 2013 WL 605865, at *6 (Md. Cir. Ct. Feb. 5, 2013) ("*Shenker* is limited, until the Court of Appeals says otherwise, to 'a cash-out merger when the decision to sell the corporation has already been made'") (quoting JAMES HANKS, MARYLAND CORPORATION LAW § 6.6A at 192 (2012 Supplement)).

Lastly, Maryland law recognizes corporate exculpation provisions that protect corporate directors from any harm they cause unless it "was committed in bad faith," "[w]as the result of active and deliberate dishonesty," or if the "director actually received an improper personal benefit."  MD. CODE, CORPS. & ASS'NS § 2-418(b)(1). The Fourth Circuit has held that such an exculpation provision can form the basis of a motion to dismiss.  See *Hayes v. Crown Central Petroleum Corporation*, 78 F. App'x 857, 865 (4th Cir. 2003).

2.  *Application*

The plaintiffs' fiduciary duty claim is blocked by the requirement that suits against directors for violations of section 2-405.1(a) must be brought as shareholder derivative actions or by a corporation itself.  The plaintiffs aver that they are suing the directors because of their role "in the management and administration of the affairs of BH REIT."  Complaint ¶ 108.  Lawsuits against directors in their managerial capacities must be brought through section 2-405.1, which cannot be done directly by the shareholders.  *See* MD. CODE, CORPS. & ASS'NS § 2-405.l(g).  The plaintiff have not met the requirements for bringing a derivative action.  *See* Motion at 15 n.7. Therefore, their breach of fiduciary duty claim must be dismissed.

Even if the plaintiffs were bringing their claim within a shareholder derivative suit, they have failed to state a claim for breach of fiduciary duty.  To state a claim for a breach of section 2-405.1, the plaintiffs would have to show that the directors did not act "[i]n good faith," "[i]n a manner [they] reasonably believe[d] to be in the best interests of the corporation," or "[w]ith the care that an ordinarily prudent person in a like position would use under similar circumstances."  *See* MD. CODE, CORPS. & ASS'NS § 2-405.l(a).  The plaintiffs claim that the directors breached those duties by pricing the DRP shares "at an inflated and completely arbitrary level . . . without taking any reasonable steps to inform themselves as to a fair value for BH REIT shares" and "by misleadingly suggesting that the shares were valued in accordance

- 14 -

with the rules of FINRA." Complaint ¶ 109. The plaintiffs are incorrect. BH REIT very clearly disclosed that the DRP price was "arbitrarily determined" and that "the price bears no relationship to our book or asset values, or to any other established criteria for valuing issued or outstanding shares." *See* Motion at 6. The plaintiffs insist that the DRP pricing was still somehow reckless and misleading, but the court -- along with other courts that have considered similar offerings -- disagrees. See *Allyn v. CNL Lifestyle Properties, Inc.*, No. 6:13-CV-132-ORL-36, 2013 WL 6439383, at *4 (M.D. Fla. Nov. 27, 2013); *Becker*, 2013 WL 6068793, at *5; *In re Apple REITs Litigation*, No. 11-CV-2919, 2013 WL 1386202, at *14 (E.D.N.Y. Apr. 3, 2013). The plaintiffs have alleged nothing more than "mere suspicions." See *Bender*, 917 A.2d at 152. Furthermore, the directors did in fact price the shares in compliance with FINRA -- FINRA allowed them to keep the shares at the initial offering price for 18 months, and afterward, when the directors reevaluated the shares, they changed the price to reflect the current value. *See* Motion at 6-7.

Insofar as the facts alleged here are concerned, *Shenker* did not impose any additional duties on the directors beyond those created by section 2-405.1. Courts have only applied the fiduciary duty from *Shenker* in situations involving the sale of a corporation, and this court sees no reason to be the first to impose an additional duty in an unrelated circumstance.

Lastly, the directors are protected by BH REIT's exculpation provisions.  The

exculpation provision in BH REIT's charter stated:

> LIMITATION OF DIRECTOR AND OFFICER
> LIABILITY.  To the maximum extent that Maryland law,
> in effect from time to time, permits the limitation of the
> liability of directors and officers of a corporation, no
> present or former Director or officer of the Company shall
> be liable to the Company or to any Stockholder for money
> damages.

Motion at 16-17.  There was also an exculpation provision in the DRP Registration

Statement that insulated directors from "any responsibility or liability as to the value

of our shares."  *Id.* at 4.  These provisions protected the directors from any liability

unless the plaintiffs could show "bad faith," "active and deliberate dishonesty," or "an

improper personal benefit."  *See* MD. CODE, CORPS. & ASS'NS § 2-418(b)(1).  As

discussed above, the plaintiffs have made only conclusory and unsupported

allegations regarding the directors' "bad faith," "active and deliberate dishonesty," or

reception of "improper personal benefit[s]."  They therefore cannot overcome the

exculpation provisions.

To summarize, the plaintiffs' breach of fiduciary duty claim must be dismissed

because:  (1) their claim should have been brought as a shareholder derivative action;

(2) even if the plaintiffs had brought their claim as a derivative action, they could not

overcome the business judgment rule; (3) the directors did not owe a duty outside of

section 2-405.1; and (4) the directors were shielded by BH REIT's exculpation
provisions.

## C.   Violations of Exchange Act

The plaintiffs also bring two claims under the Exchange Act, 15 U.S.C. § 78n.
The first is for a violation of section 14(e), 15 U.S.C. § 78n(e), and Rule 14e-2(b), 17
C.F.R. § 240.14e-2, promulgated thereunder, alleging that the directors made
misrepresentations while encouraging shareholders not to accept CMG's mini-tender
offers.  *See* Complaint ¶¶ 112-14.  Specifically, the plaintiffs maintain that the
Schedule 14D-9 statements that the directors released after CMG's offers "failed to
disclose material facts that [sic] about the value of the Company's stock and that FFO
["funds from operations," or cash flow generated by operations] of the Company has
never been sufficient to cover its distributions."  Complaint ¶ 113.  The plaintiffs also
claim that the directors violated section 14(a), 15 U.S.C. § 78n(a), and Rule 14a-9,
17 C.F.R. § 240.14a-9, promulgated thereunder, by misleadingly stating in the proxy
statement released in connection with the 2011 charter amendments that one
objective of the amendments was "'to position the Company to pursue a liquidity
event in the future' and that the proposal with regard to tender offers was necessary
to 'protect' the Company's stockholders."  ¶¶ 116-22.  These claims must be
dismissed both under the heightened pleading standards of the Private Securities

Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4, and for failure to state a claim under sections 14(e) and 14(a).

### 1. *PSLRA Standards*

The PSLRA requires a plaintiff alleging securities fraud to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," 15 U.S.C. § 78u-4(b)(2)(A), that is, facts giving rise to a strong inference of "scienter."[2]  In *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007), the Supreme Court held that "[t]o qualify as 'strong' . . ., an inference of scienter must be more than merely plausible or reasonable -- it must be cogent and at least as compelling as any opposing inference of non-fraudulent intent." *Id.* at 314. Accordingly, to ascertain whether the plaintiff has stated a cognizable claim for securities fraud, the court must compare the "competing inferences rationally drawn from the facts alleged" to determine whether the facts alleged sufficiently support a strong inference of scienter. *Id.*

---

[2]     The Supreme Court has defined scienter as "a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976).  The Fifth Circuit has held that scienter can be shown by "either intent or *severe recklessness*."  See *Financial Acquisition Partners LP v. Blackwell*, 440 F.3d 278, 287 (5th Cir. 2006) (emphasis in original).  Severe recklessness "is limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." *Central Laborers' Pension Fund v. Integrated Electrical Services Inc.*, 497 F.3d 546, 551 (5th Cir. 2007) (internal quotation omitted).

The plaintiffs fail to sufficiently plead scienter for either of their Exchange Act claims.  In relation to their 14(e) claim, the plaintiffs allege that in responding to CMG's mini-tender offers, the directors of BH REIT did not disclose that BH REIT's cash flow was not sufficient to cover distributions, because they were concerned about losing control of the company.  *See* Complaint ¶ 16; Response at 7-8, 33-34.  This allegation makes little sense given that each mini-tender offer was for 0.34% of outstanding shares.  *See* Motion at 10.  Furthermore, CMG specified that it was not trying to take control of BH REIT.  See *id.*  And lastly, the plaintiffs' allegation is a non-issue because the directors of BH REIT *did* repeatedly disclose that distributions came from investor offerings and loans.  *See* Motion at 31.  While they may not have directly repeated that disclosure again in the Schedule 14D-9 statements, they were not required to.  See *Garber v. Legg Mason Inc.*, 347 F. App'x 665, 669 (2d Cir. 2009).  Furthermore, the directors incorporated their prior disclosures by reference in the Schedule 14D-9 statements.  *See* Reply at 8-9.  The plaintiffs try to pick apart these disclosures and argue that they were misleading, thus giving rise to an inference of scienter.  *See* Response at 31-33.  The court disagrees.  A review of these many disclosures could lead to only one conclusion, *viz.*, that BH REIT was not making distributions from cash flow, which is all the company was required to disclose.  See *Apple REITs*, 2013 WL 1386202, at *13.

The plaintiffs' section 14(a) claim similarly fails to plead scienter. The plaintiffs argue that the directors somehow knew that requiring disclosures from mini-tender offerors did nothing to protect investors, and that saying as much was knowingly misleading. *See* Response at 38-39. However, they fail to allege any details to support this allegation, as required by the PSLRA. *See* 15 U.S.C. § 78u-4(b)(1).

The PSLRA also requires that a plaintiff "prov[e] that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages." *See* 15 U.S.C. § 78u-4(b)(4). The Supreme Court has applied "damages" in that section to mean "economic loss." See *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 347 (2005). Plaintiffs who sue under the Exchange Act because of a missed tender opportunity must show that they suffered an economic loss "by retaining the stock instead of selling it at the premium offered by the tender offeror." *Horowitz v. Pownall*, 582 F. Supp. 665, 668 (D. Md. 1984). If the market price of a stock was higher than the tender offer when that offer was made, a plaintiff cannot show that he suffered an economic loss as a result of not taking the offer. *Id.*

Both of the plaintiffs' Exchange Act claims seek damages to compensate them for losing the opportunity to sell their shares through mini-tender offers. Therefore, the plaintiffs would have to show that they would have been able to make more money by selling their shares through a mini-tender offer than they did by retaining

- 20 -

their shares.  The plaintiffs cannot make such a showing.  Regarding the 14(e) claim,

CMG's mini-tender offers were for $1.80 per share.  Complaint ¶¶ 89, 95.  However,

shares of BH REIT were selling for $1.75-$3.25 per share in the secondary market at

the time of CMG's first offer, Complaint ¶ 90, and for $2.35-$3.00 per share at the

time of the second offer.  Complaint ¶ 95.  Therefore, declining CMG's tender offers

could not have caused the plaintiffs an economic loss.

The plaintiffs also cannot show with that they suffered an economic loss as a

result of the charter being amended to require mini-tender offerors to make certain

disclosures.  The plaintiffs argue that the amendments caused a "[r]eduction of their

liquidity options," *see* Response at 39, but such a claim is purely speculative, as the

plaintiffs cannot show that they would have received additional mini-tender offers in

the absence of the charter amendments.  The plaintiffs therefore cannot show that

the amendments "caused [a] loss" for which they "seek[] to recover damages," as

required by the PSLRA.  *See* 15 U.S.C. § 78u-4(b)(4).

2. *Section 14(e) and Rule 14e-2(b)*

The plaintiffs' section 14(e) claim also must be dismissed because the plaintiffs

fail to plead a material omission on the part of the directors.  Section 14(e) states

that:

> It shall be unlawful for any person to make any untrue
> statement of a material fact or omit to state any material
> fact necessary in order to make the statements made, in the
> light of the circumstances under which they are made, not

> misleading, or to engage in any fraudulent, deceptive, or
> manipulative acts or practices, in connection with any
> tender offer or request or invitation for tenders, or any
> solicitation of security holders in opposition to or in favor
> of any such offer, request, or invitation.

15 U.S.C. § 78n(e).  "The Court must dismiss a complaint founded on allegations of

securities fraud if the allegedly omitted or misrepresented information was in fact

appropriately disclosed." *White v. Melton*, 757 F. Supp. 267, 272 (S.D.N.Y. 1991).

The court can consider publicly filed documents while making this determination.

See *In re Keyspan Corporation Securities Litigation*, 383 F. Supp. 2d 358, 374 n.6

(E.D.N.Y. 2003); *Sable v. Southmark/Envicon Capital Corp.*, 819 F. Supp. 324, 333

(S.D.N.Y. 1993).

As discussed above, the directors of BH REIT repeatedly disclosed that

distributions came from new offerings and loans.  The prospectuses to which

shareholders had to agree before purchasing shares of BH REIT stated that

distributions did not necessarily come from the company's cash flow.  *See, e.g.*, Exhibit

3 to Defendants' Appendix at 120 ("[W]e have and may continue to pay all or a

substantial portion of our distributions from the proceeds of such offerings or from

borrowings in anticipation of future cash flow.") (from 2006 Prospectus).

Furthermore, the Form 10-K that BH REIT filed with the SEC for 2010, before

CMG's mini-tender offers, stated that distributions could come from "borrowings" or

offering "proceeds."  *See* Exhibit 9 to Defendants' Appendix at 11, 36.  The court

concludes that these disclosures were sufficient, and that the plaintiffs have therefore failed to plead a material omission on the part of the directors.

### 3. *Section 14(a) and Rule 14a-9*

The plaintiffs similarly cannot show that the directors violated Section 14(a). A director violates Section 14(a) and Rule 14a-9 if he releases a proxy statement "which, at the time and in the light of the circumstances under which it is made, is false and misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. § 240.14a-9(a).  To state a claim for a violation of section 14(a), a plaintiff must show that: (1) a proxy statement contained a material misrepresentation or omission; (2) the "defendants acted at least negligently in distributing the proxy statement"; and (3) the proxy statement was an "essential link" in causing the transaction at issue.  *Hulliung v. Bolen*, 548 F. Supp. 2d 336, 339 (N.D. Tex. 2008) (Godbey, J.) (internal quotations omitted).  To show that a statement of belief was false, a plaintiff must establish both that the speaker did not actually believe it, and that the statement expressed something false about its subject.  See *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1095-96 (1991).

The plaintiffs have not made allegations sufficient to show that the directors did not subjectively believe that the charter amendments that required mini-tender offerors to make certain disclosures would "protect the Company and its

stockholders."  They have also not sufficiently alleged that such an idea is objectively

false.  Furthermore, the parts of the Schedule 14D-9 statements that referred to

"position[ing] the Company to pursue a liquidity event in the future" were quite

clearly related to separate amendments and should not have misled the plaintiffs

about the purpose of imposing a disclosure requirement on mini-tender offerors.  *See*

Exhibit 7 to Defendants' Appendix at 5.

## D.  Unjust Enrichment

Lastly, the plaintiffs' claim for unjust enrichment must be dismissed.  To state

a claim for unjust enrichment under Maryland law, a plaintiff must show "(1) [a]

benefit conferred upon the defendant by the plaintiff; (2) [a]n appreciation or

knowledge by the defendant of the benefit; and (3) [t]he acceptance or retention by

the defendant of the benefit under such circumstances as to make it inequitable for

the defendant to retain the benefit without the payment of its value."  *Hill v. Cross*

*Country Settlements, LLC,* 936 A.2d 343, 351 (Md. 2007).  "'[T]he burden is on the

plaintiff to establish that the defendant holds plaintiff's money and that it would be

unconscionable for him to retain it.'"  *Bank of America Corp. v. Gibbons*, 918 A.2d 565,

569 (Md. Ct. Spec. App. 2007) (quoting *Plitt v. Greenberg,* 219 A.2d 237, 241 (Md.

1966)).

As the plaintiffs have failed to state claims for either breach of fiduciary duty

or violations of the Exchange Act, the conduct of the defendants could hardly be

deemed "unconscionable," and there is nothing "inequitable" which must be undone.

Therefore, the plaintiffs' unjust enrichment claim is dismissed.

### III.  CONCLUSION

For the reasons stated above, the defendants' motion is **GRANTED**.

Judgment will be entered for the defendants.

**SO ORDERED**.

March 27, 2014.

_A. Joe Fish_
_____
**A. JOE FISH**
**Senior United States District Judge**